The SIERRA CLUB, A Non–Profit Corporation; and Native Ecosystems Council, A Non–Profit Montana Corporation, Plaintiffs,

v.

UNITED STATES FOREST SERVICE, United States Department of Agriculture, Roberta Moltzen, Forest Supervisor, Black Hills National Forest, Tom L. Thompson, Acting Regional Forester, Region Two, and F. Dale Robertson, Chief of the United States Department of Agriculture, Defendants,

Black Hills Forest Resource Association, Intervenor.

Civ. A. No. 92–5101.

United States District Court, D. South Dakota, Western Division.

Oct. 28, 1993.

James F. Margadant, Sieler & Trimble, Rapid City, SD, Jack R. Tuholske, Missoula, MT, for The Sierra Club, Native Ecosystems Council.

Robert A. Mandel, U.S. Atty's. Office, Rapid City, SD, for U.S. Forest Service, Dept. of Agriculture, Roberta Moltzen, Tom L. Thompson, F. Dale Robertson.

Gary R. Richards, Richards, Hood & Brady, P.C., Spearfish, SD, for Black Hills Forest Resources Ass'n.

## MEMORANDUM OPINION AND ORDER

BATTEY, Chief Judge.

### PROCEDURAL HISTORY

Sierra Club and Native Ecosystems, Inc. (plaintiffs) in this case seek judicial review of a decision by the defendants to allow two timber sales in a portion of the Black Hills National Forest. Pending before the Court are cross motions for summary judgment by plaintiffs, defendants, and intervenor.

### FACTS

The Black Hills National Forest consists of 1,235,780 acres, mostly in western South Dakota, but also extending into a portion of eastern Wyoming. Tr. Vol. IX, I–1, I–2. The Victoria Planning Area is part of the Black Hills National Forest and consists of 15,372 acres of national forest land. Tr. Vol. I, 79. Victoria is located east and southeast of Pactola Reservoir, north of Sheridan Lake, and west and southwest of Rapid City, South Dakota. Tr. Vol. I, 80. The area is bounded on the north by Rapid Creek and by a ridge south of South Dakota Highway 44, on the west by South Dakota Highway 385, on the south by Sheridan Lake Road, and on the east by a ridge running north to south from Tomaha Point along the ridge east of the Victoria drainage to Sheridan Lake Road. Tr. Vol. I, 79–80.

In 1990, after a survey of the Victoria Area revealed a drastic absence of vegetative diversity, the Forest Supervisor for the Black Hills National Forest, Roberta Moltzen, ordered an Environmental Assessment (EA) prepared and then issued a Decision Notice and Finding of No Significant Impact (FONSI) as to proposed timber sales in Victoria. This decision of the Forest Supervisor was appealed within the agency by plaintiff Sierra Club. One of the issues raised by Sierra Club in the 1990 administrative appeal was that the EA was defective under the National Environmental Policy Act (NEPA) because the EA considered an inadequate range of alternative actions. The appeal resulted in the Forest Supervisor withdrawing her decision and ordering a new EA in which she attempted to address the concerns of Sierra Club.

After conducting another EA, the Forest Supervisor issued a second Decision Notice and FONSI in January 1992. The 1992 Decision Notice adopted Alternative # 4 as proposed in the EA, with minor modifications. Tr. Vol. I, 67. The decision provided for two timber sales to take place in Victoria, the Tamarack Timber Sale, and the Sisters Timber Sale. Together, the decision provided for the following actions:

(1) Timber harvest on 3,209 acres (21 percent of the Victoria Area), yielding approximately 10.1 million board feet of sawlogs beginning in 1992 in Tamarack and 1993 in Sisters. This figure was a reduction of 78 acres from that recommended by Alternative # 4 for the Sisters Timber Sale in order to create cover for big game. Also, the decision provided for patch clearcutting of 10 acres in mature sawtimber to create forage requirements for big game.

(2) After timber harvest, 2,858 acres would be subject to precommercial thinning. This figure was reduced by 187 acres from that recommended by Alternative # 4 to create cover for big game. The figure also included an additional 155 acres of precommercial thinning in the Prairie Creek cable unit.

(3) After timber harvest and thinning, brush/slash piling, brush pile burning/disposal, and erosion control work would be pursued on some of the acres.

(4) Aspen cutting and release would take place on about 20 acres.

(5) About 3.4 miles of new road would be constructed. These roads would be closed to the public after the timber harvest from the area is completed.

(4) About 9.8 miles of road would be reconstructed, 8.3 miles of road would be obliterated, and about 50 miles of road would be maintained.

(5) Pine trees encroaching on meadows on 789 acres would be removed.

Tr. Vol. I, 67. In addition to the foregoing, the decision also provided for many mitigation measures designed to lessen the environmental impact of the timber sales in Victoria. Some of those mitigation measures included the following.

(1) Local roads and roads not needed for access to private land within the management prescription area 5B would be closed from January 1 to May 1.

(2) In the Sisters sale area, logging would be limited to one unit at a time between January 1 and May 1 and all roads not necessary to harvest would be closed from January 1 to May 1.

(3) Timber harvest in Sisters would be limited to 3 to 4 years.

(4) All newly constructed roads would be closed to the public.

(5) Any active raptor nesting sites found during the timber sales would be protected.

(6) If any active goshawk nest is found, it would be given a minimum of 20 to 30 acres as a buffer zone where no treatment would take place.

(7) If any critical habitat of any endangered, threatened, or sensitive species is found, it would be protected as would the species themselves.

(8) All snags which are not safety hazards would be left standing. In addition, a minimum of 10 live trees per acre would be left standing for snag recruitment, if possible in clumps around existing snags and away from access by firewood gatherers. Areas that do not have sufficient down logs or untreated slash piles will have such conditions created.

(9) Snags would be monitored as the timber sales progress and 10 years into the future to ensure that snag numbers remain adequate.

Tr. Vol. I, 97–99.

After the January 1992 Decision Notice and FONSI was issued by the Forest Supervisor, the plaintiffs filed another administrative appeal. They did not raise the issue of the adequacy of alternatives considered in the second EA. The Acting Regional Forester affirmed the Forest Supervisor's decision. Tr. Vol. IV, 16. Review of the decision at a higher administrative level was declined, thus making the Acting Regional Forester's decision the final agency decision. Shortly thereafter, plaintiffs filed their complaint in this Court seeking judicial review of the agency's decision pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(a). The plaintiffs allege that the decision by the agency violates various provisions of NEPA, 42 U.S.C. § 4332 *et seq.*, and of the National Forest Management Act, 16 U.S.C. § 1604 *et seq.*

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 488 (1962). In determining

whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Recently, the Supreme Court noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

The trilogy of *Celotex, Anderson,* and *Matsushita* provide the Court with a methodology in analyzing defendants' motion. Under this trilogy, it is incumbent upon each party, based upon the showing set forth by the other parties in their motions, to establish significant probative evidence to prevent summary judgment. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991).

**B. Standing**

■ Defendants argue that plaintiffs lack standing to challenge the Forest Service timber sales in this case. Some standing requirements are merely prudential, while others are jurisdictional, being tied to the case or controversy requirement in Article III of the United States Constitution. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The plaintiffs have the burden to establish their standing because it is the plaintiffs who are invoking federal jurisdiction. *Id.* When plaintiffs' standing is challenged in a motion for summary judgment, plaintiffs must show specific facts, through affidavit or other evidence, in support of the elements of standing. *Id.* at 561–62, 112 S.Ct. at 2137.

■ Regarding constitutional standing requirements for associations such as plaintiffs herein, if there is no direct injury to an association itself, an association may establish standing as a representative of its members. *Minnesota Fed'n of Teachers v. Randall,* 891 F.2d 1354, 1358 (8th Cir.1989). To do so, the association must establish three elements: (1) that the members of the association have standing as individuals, (2) that the interests which the association asserts must be germane to the association's purpose, and (3) that "neither the claim asserted, nor the relief it requested, ... require participation of the organization's individual members in the lawsuit." *Id.* (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)).

■ In order to meet the first requirement above, that the association's members have standing as individuals, the core constitutional requirements regarding the individual members' standing are as follows:

1. that the plaintiff has suffered an "injury in fact." An injury in fact is "an invasion of a legally-protected interest which is

 a. concrete and particularized, ... and

 b. 'actual or imminent, not "conjectural" or "hypothetical." ' "

2. that the plaintiff's injury is causally connected to the defendant's conduct of which the plaintiff is complaining, and

3. "it must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable decision.'"

*Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. at 2136 (citations omitted).

Plaintiff the Sierra Club has submitted affidavits from Dave Strom and Sam Clauson. Both men are officers in the Black Hills Group of the Sierra Club. These affidavits establish that both individuals live adjacent to the Victoria Planning Area; both have used and plan to continue to use the Victoria Planning Area for hiking, hunting, and observing wildlife; and both believe that if the defendant's present decision remains unaltered, their enjoyment of the Victoria Planning Area will be harmed. *See* Affidavit of Dave Strom, Docket No. 70; Affidavits of Sam Clauson, Docket Nos. 69 and 77.

The United States Supreme Court has said that:

under our case-law, one living adjacent to the site for proposed construction of a federally-licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Defenders of Wildlife,* 504 U.S. at 573 n. 7, 112 S.Ct. at 2142–43 n. 7. In addition, the Court also stated that "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing." *Id.* at 562–63, 112 S.Ct. at 2137 (citing *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)).

Sierra Club's claims against defendants in this lawsuit include allegations that the proposed timber sales will adversely affect populations of white-tail deer and many bird species. The affiants claim that their enjoyment of the Victoria Planning Area rests in part on the continued presence of these animals. It is clear that the affiants would have standing as individuals: they allege injuries in fact which are concrete and particularized and imminent, the defendants' proposed timber sales are the cause of these injuries and also the action of which affiants complain, and finally, it is likely that the affiants' alleged injuries would be redressed by the relief they seek in this Court. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. at 2136.

The parties to this lawsuit have not addressed the elements necessary for the Sierra Club, as an association, to have standing solely as a representative of its members. However, the record is sufficiently developed for the Court to resolve these issues. As stated above, the Sierra Club has established the first element. The second element requires that the interests that the association asserts in this lawsuit must be germane to the associational purpose. The Sierra Club's purpose is to preserve the environment. Thus, the interests the Sierra Club asserts in this lawsuit are germane to its purposes.

Finally, the third element is that the participation of the Sierra Club's individual members must not be necessary to the association's claim or to the relief requested by the association. The Sierra Club is requesting the Court to enter injunctive relief, ordering the Forest Service to prepare another Environmental Assessment, to prepare an Environmental Impact Statement, and to revise its decision so as to comply with the forest plan created under the auspices of the National Forest Management Act. Neither the claims of Sierra Club, nor the relief it seeks, require the participation of the individual members of the Sierra Club. Thus, the Sierra Club has established evidence sufficient to survive a challenge to its standing on a motion for summary judgment.[1]

---

1. Defendants also purport to challenge the plaintiffs' prudential standing, but defendants do not even recite the standard necessary to show prudential standing. Prudential standing requirements are met when the interest asserted by the plaintiff falls within the zone of interest meant to be protected by the statute. *National Wildlife Fed'n v. Agricultural Stabilization & Conservation Serv.,* 955 F.2d 1199, 1203 n. 5, 1204 (8th Cir. 1992). Without further argument from either party, it appears to this Court that the environmental interests asserted by plaintiffs herein fall within the zone of interests meant to be protected by the National Environmental Policy Act and

The Court has not addressed the standing of the other plaintiff in this lawsuit, Native Ecosystems Council, or the standing of its members. However, when one plaintiff has established its standing, "the standing of other plaintiffs is immaterial." *Nat'l Wildlife Fed'n v. Agricultural Stabilization & Conservation Serv.*, 955 F.2d 1199, 1203 (8th Cir.1992) (citing *Bowen v. Kendrick*, 487 U.S. 589, 620 n. 15, 108 S.Ct. 2562, 2580 n. 15, 101 L.Ed.2d 520 (1988)).

### C. Exhaustion of Administrative Remedies

■ Plaintiffs each filed administrative appeals of the Forest Service decision being challenged in this lawsuit. However, plaintiffs have raised at least one issue in this lawsuit that was not raised before the agency: whether or not the second Environmental Assessment (EA) prepared by the agency considered a reasonable range of alternative courses of action. *Compare* Plaintiffs' Complaint *with* Tr. Vol I, at 5–59. Defendants argue that the Court should not reach the merits of this issue because plaintiffs have failed to exhaust their administrative remedies as to this issue.

■ Failure to exhaust administrative remedies does not automatically result in a forfeiture of the opportunity to pursue judicial review. *Sierra Club v. Robertson*, 784 F.Supp. 593, 598 (W.D.Ark.1991). Rather, this Court should determine whether plaintiffs' "interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Id.* (quoting *West v. Bergland*, 611 F.2d 710, 715 (8th Cir.1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980)). The Eighth Circuit has stated that:

> *McKart [v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1960) ] and *McGee [v. United States*, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) ] teach that several factors must be weighed, including (1) whether allowing similarly situated litigants to bypass the administrative

the National Forest Management Act. Therefore, the Court declines to accept defendants' chal-

avenue would seriously impair the agency's ability to perform its function of developing facts and exercising discretion in the first instance; (2) whether allowing judicial review would encourage others to flout the administrative scheme designed by Congress; and (3) whether the circumstances require that the agency be given the first chance to correct its own errors, and to obviate, perhaps, the need for judicial review.

*Madsen v. Department of Agric.*, 866 F.2d 1035, 1039 (8th Cir.1989) (Arnold, J., concurring in part, dissenting in part). Under the circumstances presented by plaintiffs in this case, the Court concludes that it should not reach the merits of the plaintiffs' claim regarding the reasonable range of alternatives considered by the Forest Service.

The Forest Service first issued an EA in connection with the timber sales at issue in this case in 1990. The Sierra Club filed an administrative appeal alleging, *inter alia*, that the Forest Service had failed to consider a reasonable range of alternative plans. The Forest Service withdrew its EA, consulted with the Sierra Club, and issued a new EA in 1992 in an attempt to address some of the Sierra Club's concerns.

This demonstrates that (1) the Sierra Club knew how to raise the range of alternatives issue in an administrative appeal when it so desired and (2) the Forest Service was interested in addressing the Sierra Club's concerns. This leads to a third possibility: had the Sierra Club in its second administrative appeal raised the range of alternatives issue as to the second EA, the Forest Service may have addressed this issue which, in turn, may have obviated the need for judicial review. Thus, the Forest Service's autonomy and efficiency would be seriously undermined by allowing plaintiffs to circumvent the administrative appeals process on the range of alternatives issue.

Furthermore, the Court finds that plaintiffs have not demonstrated an interest in immediate judicial review of this issue. Plaintiffs have not proposed other alternative

lenge to plaintiffs' prudential standing.

courses of action which they believe the Forest Service should have considered. Indeed, the one alternative implicitly endorsed by plaintiffs—that of no action at all—*was* considered by the Forest Service. Furthermore, plaintiffs have not shown that they would be irreparably harmed should the Court decline to address the range of alternatives issue. Under the circumstances, the balance tips in favor of requiring plaintiffs to have exhausted their administrative remedies on the range of alternatives issue. Accordingly, the Court does not reach the merits of this issue.

■ In addition to the above, plaintiffs raised an issue for the first time in their reply brief on their motion for summary judgment. The issue is whether or not the EA prepared by the Forest Service was inadequate because it failed to assess the impacts of the timber sales on a small portion of the Victoria Project Area designated "PO7." The Court declines to reach this issue as well in view of the fact that the agency, as well as defendants and intervenor in this appeal, have been deprived of an opportunity to address the issue.

## D. National Environmental Policy Act (NEPA) Claims

Aside from the range of alternatives issue, plaintiffs have constructed two theories upon which they base their arguments that the Forest Service violated NEPA. First, plaintiffs argue that the Environmental Assessment (EA) which the Forest Service prepared was inadequate under NEPA. Second, plaintiffs argue that the Forest Service should have prepared an Environmental Impact Statement (EIS) regarding its decision.

NEPA requires that an EIS be prepared for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).[2] If agency regulations do not categorically require an EIS for all actions of the type which the agency is contemplating, then the agency first prepares an EA to determine whether a project will have a significant effect on the environment. 40 C.F.R. § 1501.4[3] If, as a result of the EA the agency determines that its project will significantly affect the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4. However, if after preparing the EA the agency makes a finding of no significant impact (FONSI), then the agency need not prepare an EIS. 40 C.F.R. § 1501.4.

■ In the agency of the United States Forest Service, each national forest has its own forest plan prepared in accordance with

**2.** Section 4332 provides in pertinent part as follows:

> The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall—
> ....
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
> 42 U.S.C. § 4332(2)(C).

**3.** An environmental assessment is a study of the proposed action, alternatives to the proposed action, and the environmental impacts of the action and the alternatives in order to aid the agency in determining whether the proposed action will significantly affect the environment. 40 C.F.R. § 1508.9. "Significantly" requires the agency to consider the impact of the proposal in several contexts as well as the intensity, or severity, of the impact. 40 C.F.R. § 1508.27.

the National Forest Management Act (NFMA) and each such forest plan is accompanied by an EIS for the forest prepared in accordance with NEPA. The EIS is this instance is "programmatic" because it is issued along with the NFMA-mandated forest plan. *Sierra Club v. Robertson,* 784 F.Supp. 593, 602 (W.D.Ark.1991) (citing *Ventling v. Bergland,* 479 F.Supp. 174, 176 (D.S.D.), *aff'd without opinion,* 615 F.2d 1365. (8th Cir. 1979)). A programmatic EIS which is comprehensive and well-prepared obviates the need for a subsequent site- and project-specific EIS unless new and significant environmental impacts arise which were not evaluated within the programmatic EIS. *Robertson,* 784 F.Supp. at 602–03 (citing *Minn. Pub. Interest Research Group v. Butz,* 498 F.2d 1314, 1323 n. 29 (8th Cir.1974) (*en banc* ); and 40 C.F.R. § 1502.9(c)(1)). The Forest Service may prepare an EA for site-specific projects to determine whether a supplement to the programmatic EIS is required. 40 C.F.R. § 1508.9(a); and *Robertson,* 784 F.Supp. at 603.

▓▓▓▓▓ NEPA imposes only procedural requirements. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). NEPA does not dictate a substantive environmental result. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). The policy behind NEPA is to ensure that an agency has at its disposal all relevant information about environmental impacts of a project before the agency embarks on the project. *Id.* at 371–72, 109 S.Ct. at 1858; and *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 558, 98 S.Ct. at 1219.

#### 1. Adequacy of the EA Prepared by the Forest Service

In attacking the adequacy of the Forest Service's EA prepared in this case, plaintiffs raise essentially one issue: whether the EA adequately assessed the impact that the timber sales would have on fragmentation of habitat. Specifically, the plaintiffs state that

the EA did not address the effects which roads would have on habitat fragmentation, the EA has not monitored Management Indicator Species (MIS) to determine the effect past timber sales have had on MIS, the EA failed to consider cumulative effects of past management by the Forest Service, the EA did not address impacts on PO7,[4] the EA did not address the impact on sensitive species, the EA did not address the impacts that timber harvest on private land adjoining the Victoria Project Area would have, the EA inappropriately relied on a computer model to assess habitat capabilities, and the EA did not consider the loss of biological diversity which habitat fragmentation will create.

▓▓▓▓▓ Although the plaintiffs' claims focus on the inadequacy of the EA, at bottom their claim is that the Forest Service's finding of no significant impact (FONSI) regarding the timber sales is in error. An agency's FONSI is reviewed on an arbitrary and capricious standard. *Audubon Society of Central Arkansas v. Dailey,* 977 F.2d 428, 434–35 (8th Cir.1992). An agency decision will not be reversed under the arbitrary and capricious standard of review unless "the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Specifically, as to an agency's FONSI, the reviewing court considers roughly corresponding factors such as:

(1) whether the agency took a "hard look" at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

---

4. As addressed above, the Court does not reach the issue of the failure to address impacts on PO7 in the EA because plaintiffs failed to raise this issue below.

(4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Dailey,* 977 F.2d at 434 (quoting *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 681–82 (D.C.Cir.1982)); *Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 127 (D.C.Cir.1985). It is the above-described standard which this Court must apply to plaintiffs' attack of the EA and FONSI made by the Forest Service in this case.

■ One of the purposes for which an agency prepares an EA is so that the agency can determine what impacts will accompany a proposed project and whether those impacts are significant. The Court concludes that the Forest Service did not act arbitrarily or capriciously when it examined the impacts of the proposed timber sales and found that there would be no significant impact.

**a. failure to consider impacts on sensitive species, failure to monitor, failure to consider impacts of roads, failure to address cumulative effects, failure to address impact of timber harvest on private land**

■ Plaintiffs' argument that the EA failed to consider the impacts of the timber sales on sensitive species is unfounded. The EA identifies this issue and discusses the impacts. *See* Tr. Vol. I, 133, 233. Furthermore, plaintiffs have pointed to no sensitive species which they believe should have been considered by the EA which were not considered.

■ The plaintiffs' claims that the Forest Service has not done any monitoring in order to deduce impacts of past timber sales is also without merit. The EA indicates that a calling survey and a walk-through survey for goshawks was done to determine goshawk populations in the Victoria Project Area. *See* Tr. Vol. I, 132, 242. Furthermore, the EA makes mention of results of hunting surveys which the Forest Service obtained from the South Dakota State Department of Game, Fish, and Parks regarding white-tailed deer populations in the Victoria Project Area. *See* Tr. Vol. I, 155.

■ The plaintiffs' claim that the EA did not consider the impact which road construction and use would have on habitat fragmentation in the project area is also unfounded. The EA specifically considered the impact road construction and use would have on white-tailed deer and elk habitat. *See* Tr. Vol. I, 134–35, 222–23. The EA concluded that road use and construction would have a negative effect on deer habitat. Tr. Vol. I, 135, 223. However, the EA recommended that the negative effect of road construction and usage on deer habitat could be mitigated by closing Forest Service roads for the months of January through April and by obliterating some roads. *See* Tr. Vol. I, 97, 135, 223. The EA noted that, to a certain extent, habitat fragmentation caused by roads would be a problem even if no timber sales took place because of the high density of existing roads, many of which were access roads to privately-owned property. Tr. Vol. I, 135. If the timber sales did not take place, the EA pointed out that no existing roads within the project area would be obliterated or closed. Tr. Vol. I, 135, 223.

■ The plaintiffs' argument that the EA failed to address the cumulative effects of past management on the project area is also without merit. The EA examined the cumulative effects of the actions from the past ten years and the projected impact for the next five years. *See* Tr. Vol. I., 146. The EA notes that white-tailed deer populations have declined over the period of time examined and that there have been no significant cumulative effects on the vegetation in the project area. Tr. Vol. I., 155–56.

■ The plaintiffs argue that the EA is inadequate because it did not address the impacts that timber harvest on private land adjoining the Victoria Project Area would have. However, plaintiffs fail to demonstrate how this is relevant to the agency's inquiry under NEPA. NEPA requires the agency to determine the impacts *of the agency's proposed action* on the human environment. Plaintiffs have pointed to no provision of NEPA which would require the Forest Service to determine the impacts of activities of third parties who are not licensed by or

agents of the Forest Service. *See* 42 U.S.C. § 4332(2)(C), and 40 C.F.R. § 1501.

### b. use of HABCAP computer model

■ Plaintiffs also argue that the EA inappropriately relied on the computer model, HABCAP, to assess habitat capabilities. HABCAP is a computer model which projects the effects of a planned management activity on the habitat capabilities of various species of animals and birds on a particular parcel of land. Plaintiffs argue that it is inappropriate for the Forest Service to use HABCAP because HABCAP is based on data for all of Region Two, which includes Wyoming, Colorado, and South Dakota. Plaintiffs argue, citing 40 C.F.R. § 1502.24,[5] that HABCAP should be based on site-specific data from the Victoria Planning Area in order for its use to comply with NEPA requirements for scientific accuracy.

The Court notes initially that the Forest Service did not rely on HABCAP alone to predict the impacts which the proposed timber sales in the Victoria Project Area would have on habitat capabilities. In analyzing the effects which the sales would have on biological environmental factors, the EA listed HABCAP as only one of *seven* different tools used to analyze diversity of plant and animal life. Tr. Vol. I, 125.[6] Furthermore, as mentioned above, the Forest Service also relied on actual surveys of wildlife to determine the impacts of past timber sales on animal habitats. Tr. Vol. I, 132, 155. In any case, however, the Court finds that the Forest Service's use of the HABCAP computer model does not violate the requirements of NEPA.

Habitat capability refers to the ability of a parcel of land to support a certain species based on the characteristics of the vegetation on that parcel. Tr. Vol. XV, 176. HABCAP is based on the recognition that, in order for a parcel of land to be able to support a particular species, the parcel must provide two basic requirements for the species: cover and forage. Tr. Vol. XV, 178, 181. "Cover" refers to the vegetation which a particular species relies upon for hiding or for ameliorating the effects of weather. Tr. Vol. VIII, A–4. "Forage" refers to areas of the forest which are not cover and which contain natural or man-made openings. Tr. Vol. VIII, A–6. The habitat needs for various species upon which HABCAP relies for its calculations are drawn from authoritative sources, the scientific accuracy of which plaintiffs do not question. Tr. Vol. XV, 176–77.[7]

The limitations and assumptions of the HABCAP program are set forth by the agency in the HABCAP user manual. Tr. Vol. XV, 178–80. Assumptions of the model include the following: (1) the potential carrying capacity of a parcel is based upon forage, (2) the ability of the animal to gather forage is modified by cover and roads, (3) acres which provide forage and acres which provide cover are not necessarily mutually exclusive, (4) animals can compensate, up to a point, for differing quality and quantity of forage and cover, and (5) animals may be able to compensate for poor cover if the parcel provides sufficiently good forage. Tr. Vol. XV, 178–79. The HABCAP user manual warns that HABCAP is appropriate for analyzing units

---

**5.** Part 1502.24 of Volume 40 of the Code of Federal Regulations provides as follows:

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analysis in *environmental impact statements*. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

40 C.F.R. § 1502.24 (1992) (emphasis supplied). The Court notes that section 1502.24 appears to apply to EISs, while the issue before the Court is whether the *EA* of the Forest Service was adequate. However, for the sake of entertaining plaintiffs' argument, the Court assumes—without

so holding—that the requirements set forth in 40 C.F.R. § 1502.24 apply to an agency's preparation of an EA.

**6.** The other six tools which the Forest Service used to accomplish its analysis were: the RIS data base, Stage II, Habitat Diversity Scorecard, HEICALC Model, SRS model, field evaluation, and use of aerial photos. Tr. Vol. I, 125.

**7.** The HABCAP model drew on the following for information about the habitat needs of various species: Hoover, R.L. & Willis, D.L., *Managing Forested Lands for Wildlife* (1984), and *Wildlife and Fish Habitat Relationships, Vol. II, Matrices* (USDA 1981). Tr. Vol. XV, 176–77.

of land from 1,000 to 20,000 acres, but that use of the model for units of land larger than 20,000 acres may produce misleading results. Tr. Vol. XV, 178. The HABCAP user manual also warns that the model should be used in conjunction with "professional expertise and knowledge of the local area, such as forage condition, human disturbance, livestock grazing, plant community differences, soil type, climatic regimes, and availability of associated habitat components such as water and snags." Tr. Vol. XV, 179. The HABCAP user manual states that the model does not take into consideration the following: (1) spatial distribution of the habitats; (2) differences in the composition of understory vegetation; (3) effects from topography; and (4) effects of competition between animals for forage, cover, space, or behavioral competition. Tr. Vol. XV, 179.

The HABCAP program is designed for use in all of Region Two, but the program can be modified when moved from one forest or district to another. Tr. Vol. XV, 176. Whether the HABCAP model used by the Forest Service in preparing this EA was modified for the Victoria Planning Area is probably unimportant, however. The HABCAP model can produce calculations of habitat capability based on variables of (1) the total acres of land involved, (2) the type of vegetation on that land, (3) the structural stage of the vegetation, and (4) the particular wildlife species involved. Tr. Vol. XV, 190–91, 194–95, 203.[8] The operator of the HABCAP program is required to input the type of vegetation on a parcel, the number of acres in that parcel, the structural stage of the vegetation, and the animal species for which the operator wishes to obtain habitat capability information. Tr. Vol. XV, 190–95. Therefore, the program operator can tailor the HABCAP run to the particular facts and circumstances of the planning area at issue.

The choices which the HABCAP program offers the operator as to types of vegetation,

8. The HABCAP program operator must designate the number of acres in a parcel and then choose one or more vegetation types from among the following list as the vegetation on that parcel:

| | | |
|---|---|---|
| aspen | cottonwood riparian | mountain shrub· |
| Douglas fir | pinion-juniper | gambel oak |
| barren | ponderosa pine | lodgepole pine |
| sagebrush | mountain grassland | spruce-fir |
| wet meadow | high elevation riparian | |

Tr. Vol. XV, 190–95, 203. The HABCAP program operator must then designate the structural stage or stages of the vegetation which the operator has told the computer exist on the parcel. The structural stages from which the operator may choose is as follows:

| | |
|---|---|
| poles with cover class A | (canopy closure <40%) |
| poles with cover class B | (canopy closure 40–70%) |
| poles with cover class C | (canopy closure >70%) |
| mature with cover class A | grass-forb |
| mature with cover class B | old-growth |
| mature with cover class C | shrub-seed |

Tr. Vol. XV, 190–95, 203. Finally, the HABCAP program operator is required to select certain wildlife species for which the operator wishes to have habitat capability of the parcel analyzed. The operator chooses one or more species from the following list of wildlife species:

| | | |
|---|---|---|
| black bear | beaver | mountain bluebird |
| bighorn sheep | bobcat | nuttal's cottontail |
| sandhill crane | mule deer | white-tailed deer |
| bald eagle | elk | Amer. peregrine falcon |
| common flicker | goshawk | blue grouse |
| ruffled grouse | mallard | sharp-tailed grouse |
| pine grosbeak | moose | snowshoe hare |
| Canada lynx | pine marten . | ruby-crowned kinglet |
| deer mouse | osprey | pygmy nuthatch |
| water pipit | pronghorn | white-tailed ptarmigan |
| vesper sparrow | red squirrel | white-crowned sparrow |
| abert's squirrel | warbling vireo | merriam's turkey |
| green-tailed towhee | wilson's warbler | yellow-bellied sapsucker |
| southern red-backed vole | virginia's warbler | macgillivray's warbler |
| hairy woodpecker | lewis's woodpecker | northern three-toed woodpecker |

Tr. Vol. XV, 190–95, 203–04.

structural stages of the vegetation, and wildlife species include vegetation and wildlife typical of the Victoria Planning Area.[9] Therefore, unless the HABCAP program operator entered choices which were not representative of vegetation, structural stages, or wildlife species in Victoria, the HABCAP result in this case would have been very closely tailored to the conditions in Victoria.

Plaintiffs, through the affidavit of their expert, argue that HABCAP cannot give reliable results for the reason, among other things, that it does not take into account the elevation of the vegetation, whether the vegetation is on a steep slope or flat area, which direction the slope faces if there is a slope, whether the soil is rich or rocky, what the rainfall is, and what the average temperature is. The Court points out that the HABCAP model does, to some extent, figure in differences in water levels and altitude. *See* Tr. Vol. XV, 203 (different categories for "mountain grassland," "wet meadow," and "high-elevation riparian."). Furthermore, the HABCAP user manual acknowledges its shortcomings with regard to spatial relationships of certain areas to other areas and effects of topography. Tr. Vol. XV, 178–80.

▮▮▮▮▮ As long as an agency reveals the data and assumptions upon which a computer model is based, allows and considers public comment on the use or results of the model, and ensures that the ultimate decision rests with the agency, not the computer model, then the agency use of a computer model to assist in decision making is not arbitrary and capricious. *Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1391 (D.C.Cir.1985) (quoting *Sierra Club v. Costle*, 657 F.2d 298, 334–35 (D.C.Cir.1981)). *See also Connecticut v. E.P.A.*, 696 F.2d 147, 158–59 (2d Cir.1982) (agency's use of computer model not arbitrary or capricious if the agency recognized the limitations of the computer model and explained the agency decision). *Cf. Residents in Protest—I–35E v. Dole*, 583 F.Supp. 653, 663–64 (D.Minn.1984) (holding that results of two computer models provided the agency with information sufficient under NEPA to understand the environmental impact of carbon dioxide from an interstate highway and to make an informed decision). The Court finds that the Forest Service in this case did reveal the limitations and assumptions upon which HABCAP is based,[10] the agency did allow and consider public comment on its use of HABCAP,[11] and the ultimate decision was made by the Forest Service, not by HABCAP.[12] Accordingly, the Court finds that the Forest Service's use of HABCAP in this case was not arbitrary or capricious.[13]

### c. failure to address loss of biological diversity

▮▮▮ Finally, plaintiffs argue that the EA was inadequate because it failed to address the loss of biological diversity which habitat fragmentation will create. Again, the plaintiffs' argument is unfounded.

---

**9.** For example, the choices of types of vegetation include aspen, ponderosa pine, and spruce-fir, all of which are found in the Victoria Planning Area. The choices as to structural stages also include choices representative of the current conditions of the Victoria Planning Area as well as conditions projected after the timber sales. Also, the choices of wildlife species include white-tailed deer, goshawk, ruby-crowned kinglet, and the northern three-toed woodpecker, all of which plaintiffs have argued are typical of the Victoria Planning Area. *See* Tr. XV, 203–04 (listing choices for vegetation, structural stages of vegetation, and wildlife species).

**10.** *See* Tr. Vol. XV, 178–79.

**11.** *See* Tr. Vol. I, 162.

**12.** *See* Tr. Vol. I, 125.

**13.** As the *Herrington* court noted, the fact that a computer model is approved for use in this case does not necessarily justify agency use of the model in all future cases. *Herrington*, 768 F.2d at 1391. Rather, the agency is under a continuing duty to evaluate the accuracy of a computer model, through empirical testing if possible, and to abandon or improve the model if shown to be unreliable. *Id. See also Ohio v. E.P.A.*, 784 F.2d 224, 226–31, *aff'd*, 798 F.2d 880, 882 (6th Cir. 1986) (holding that, while every agency use of computer models need not be validated at each site for which the model is used, where the statutory language required the agency to gather empirical data, and where there was a factor which all parties agreed was significant, but the effect of which was untested and unknown, the agency was not entitled to rely on the model without empirically testing it at the site).

The EA details the condition of the Victoria Project Area prior to the timber sales at issue in this case. The EA found that, although the Forest Plan required the area to contain a wide diversity of plant and animal life, the area—especially with regard to plant life—was not diverse. Very generally, the Victoria Area contained mostly trees of the same median age and the same height, with very few openings in the forest cover, very few areas in the grass/forb stage of development, very few extremely young trees, and very few extremely old trees. Furthermore, the EA noted that the vegetation in the area met neither the forage requirements for white-tailed deer, nor the vegetative cover requirements for that species. Tr. Vol. I, 240.

The EA analyzed the impacts of a number of alternatives which might provide a solution to this lack of diversity. Alternative # 1 was a "no action" alternative. Alternative # 4 was the action which the Forest Supervisor eventually adopted, with minor changes, as its decision.

To produce the needed diversity, Alternative # 4 proposed that some timber be cut to create the openings and forage areas which were required by the Forest Plan and which were missing from Victoria. To produce the needed snags and old growth, a great deal of which were missing from Victoria, Alternative # 4 proposed: (1) to preserve all existing snags unless they posed a fire hazard, (2) to set aside certain stands of trees from the timber sales from which it was predicted some snags would emerge, and (3) to set aside certain stands of trees to be preserved or developed into old growth.

The EA recognized that certain species which required mature, close-canopied forest for nesting—such as the goshawk and the ruby-crowned kinglet—would suffer a reduction of habitat through the creation of openings in the forest and through the creation of areas of more open-canopied stands of trees. However, the EA recognized that there was a trade-off: while the goshawk and kinglet might lose some habitat, habitat would increase for species which favored more open timber stands, such as the red-tailed hawk, the flicker, and the kestrel. Tr. Vol. I, 128, 133, 143. Furthermore, Alternative # 4 included mitigation measures to protect goshawks. Although a calling survey and a walk-through survey for goshawks in the Victoria area revealed only a few inactive nests, Alternative # 4 nonetheless provided that if any goshawk nest is discovered in the timber sales areas, the nest is to be given a 20–30 acre buffer zone. Tr. Vol. I, 132–33. This 20–30 acre buffer zone was based on recommended habitat needs published by scientific experts. Tr. Vol. I, 132.[14] Furthermore, Alternative # 4 ensured at least forty percent habitat capability in the treated areas for goshawks and other MIS. Tr. Vol. I, 128.

The EA noted that populations of white-tailed deer in the Victoria area had declined. Tr. Vol. I, 155. The EA also noted that a major limiting factor on populations of white-tailed deer in the Black Hills National Forest is the lack of adequate forage. Tr. Vol. I, 130. Forage areas include those with openings where grasses and forbs can grow. Tr. Vol. I, 130. The EA also stated that the current condition of the Victoria area did not provide sufficient forage for white-tailed deer, thus offering a possible explanation for the reduction in white-tailed deer populations in Victoria. Thus, the EA concluded that the creation of openings and grass/forbs areas would benefit the white-tailed deer by providing additional forage for that species.

The EA noted, however, that the current condition of the forest also did not contain enough cover vegetation for white-tailed deer. Tr. Vol. I, 131. If no action at all was taken, the cover requirement for white-tailed deer would continue to be deficient. Tr. Vol. I, 131. Under Alternative # 4, even existing cover would decrease slightly. Tr. Vol. I, 218. Therefore, to mitigate the negative impact of Alternative # 4 on cover vegetation, the EA proposed that 187 acres of the proposed timber sale be withdrawn in order to

---

14. The EA cites to the work of Bartlet, P.E., *Management of American Goshawk in the Black Hills National Forest*, M.S. Thesis, University of Iowa State (1974), and Erickson, M.G., *Nest Site Selection of the Goshawk (Accipiter gentilis) in the Black Hills National Forest of South Dakota*, M.A. Thesis, University of South Dakota (1987).

provide an area in which cover could be created. Tr. Vol. I, 131.

The Forest Service adopted the recommendation contained in the EA to defer 187 acres to provide cover. Tr. Vol. I, 67. The stands selected for deferral by the Forest Service had high basal areas and thus, in the agency's judgment, represented a greater potential for developing into quality cover. Tr. Vol. I, 70. In addition, areas deferred to create cover were selected because of their juxtaposition with foraging areas, which the agency considered a favorable combination for deer habitat. Tr. Vol. I, 70.

The Court finds that the agency, through the EA, took a "hard look" at the proposed project; that the agency identified the relevant areas of environmental concern; as to the problems studied and identified, the agency made a convincing case that the impact was insignificant; and where an impact was of potential significance, that the agency convincingly established that mitigation measures adopted for the project sufficiently reduced the impact to a minimum. *Dailey*, 977 F.2d at 434 (quoting *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 681–82 (D.C.Cir.1982)); *Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 127 (D.C.Cir. 1985). Accordingly, the Forest Service's preparation of the EA for these timber sales was not arbitrary and capricious or in violation of NEPA.

## 2. Whether the Forest Service Should Have Prepared an EIS

■ The general rule is that once a programmatic EIS is prepared for a forest, projects described in the Forest Plan can proceed without the necessity of a supplemental EIS for each project. *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 447 (7th Cir.1990); *Sierra Club v. Robertson*, 784 F.Supp. 593, 603 (W.D.Ark.1991). A supplemental EIS for an individual project is required *only* when new circumstances arise which will have a significant effect on the human environment *and which were not already considered in the original EIS*. 40

C.F.R. § 1502.9(c); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989); *Cronin*, 919 F.2d at 449; *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1178 (9th Cir.1990); *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987)); and *Robertson*, 784 F.Supp. at 603.[15] When plaintiffs urge a supplemental EIS should be conducted based on effects already adequately considered by the original EIS, a supplemental EIS is not required. *Cronin*, 919 F.2d at 449; *Headwaters, Inc.*, 914 F.2d at 1178; *Hickory Neighborhood Defense League*, 893 F.2d at 63; and *Texas v. United States Forest Serv.*, 654 F.Supp. 296, 298 (S.D.Tex. 1987).

■ The burden is on the plaintiff to show that grounds exist requiring the preparation of an EIS. *Robertson*, 784 F.Supp. at 606. In *Robertson*, the district court held that when the timber cutting proposed in a site-specific project did not differ significantly from the timber cutting anticipated and evaluated in the programmatic EIS, no supplemental site-specific EIS was required. *Id.* See also *Cronin*, 919 F.2d at 449 (holding supplemental EIS not necessary for site-specific timber sale where programmatic EIS considered effects of both clear-cutting and group selection and site-specific project authorized group selection); *Headwaters, Inc.*, 914 F.2d at 1180 (holding that a supplemental EIS for a site-specific timber sale was not required where programmatic EIS considered effect of timber sales on northern spotted owl and site-specific project would not have an effect on owl habitat that had not already been considered in the programmatic EIS); and *Texas v. United States Forest Service*, 654 F.Supp. at 297–98 (holding supplemental EIS not necessary for site-specific infestation and reforestation program where impacts of site-specific program were the same as those considered in the programmatic EIS).

---

**15.** Forest Service regulations are consistent with the case law. Under these regulations, a supplemental EIS is only required where a change to an existing plan is proposed which "would result in a significant change in the plan." 36 C.F.R. § 219.10(f).

■ Under the facts of this case, a programmatic EIS was in place for the entire Black Hills National Forest. Tr. Vol. VIII. Prior to the January 1992 Decision Notice becoming final, an EIS was prepared and the agency determined that no supplemental EIS to the programmatic EIS should be prepared because the January Decision Notice would have no significant environmental impacts not already considered and evaluated in the programmatic EIS. Tr. Vol. I, 73–74, 78–400.

Plaintiffs urge the necessity of an EIS for the January 1992 Decision Notice, but they fail to demonstrate any significant environmental effect of the January 1992 decision which was not foreshadowed by and considered in the Forest Plan and the programmatic EIS. Inasmuch as the burden falls on the plaintiffs to demonstrate the existence of new and significant environmental impacts not adequately considered by the programmatic EIS, *see Robertson*, 784 F.Supp. at 606, plaintiffs' claim that the Forest Service should prepare a supplemental EIS must fail. In short, plaintiffs have failed to demonstrate the necessary factual predicate which would mandate a supplemental EIS.

### E. National Forest Management Act (NFMA) Claims

NFMA requires that the Secretary of Agriculture prepare, for each forest in the national forest system in the United States, a Land and Resource Management Plan (Forest Plan). *See* 16 U.S.C. § 1604(a). Forest Plans coordinate forest management to provide for multiple uses of the forest, including outdoor recreation, grazing, timber harvesting, watershed protection, and development of wildlife and fisheries. Tr. Vol. IX, hh, II–27. Forest Plans provide for multiple use by setting forth areas of emphasis for various subdivisions of the forest ("management prescriptions"), permissible actions for various areas of the forest, and guidelines through which the Forest Service may achieve diversity of plant and animal life throughout the forest. *See* 16 U.S.C. § 1604(g). Each Forest Plan must be prepared in accordance with NEPA. *See* 16 U.S.C. § 1604(g)(1). Projects undertaken within a national forest must comply with the Forest Plan for that forest. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

A Forest Plan for the Black Hills National Forest, of which the Victoria Planning Area is a subdivision, was adopted in 1983. *See* Tr. Vol. IX. A programmatic Environmental Impact Statement (EIS) was prepared in connection with the Forest Plan for the Black Hills National Forest which analyzed the environmental impacts of various plan alternatives which the Forest Service had considered. *See* Tr. Vol. VIII, Vol. X.

The Forest Plan sets forth three levels of requirements in ascending order of specificity: goals, objectives, and management requirements. *See* Tr. Vol. IX, hh–ii. "Goals" represent the desired future condition of the Black Hills National Forest. Tr. Vol. IX, hh. "Objectives" are "time-specific statements of measurable results that respond to pre-established goals (CFR. 219.3). These objectives are quantitatively displayed as outputs that *could* be provided or activities that are expected to occur." Tr. Vol. IX, hh (emphasis supplied). "Management Requirements" are requirements that must be met when a decisionmaker within the Forest Service pursues administrative action or issues permits, although the Forest Plan contemplates that some management requirements are merely estimates and that the administrative decisionmaker should use her professional judgment on "a case-by-case basis to meet circumstances on the ground." Tr. Vol. IX, III–1, III–2.

Through the goals, objectives, and management requirements, the Forest Plan anticipates that the Black Hills National Forest will be brought into the desired future condition described in the Forest Plan. The Forest Plan acknowledges that it will take some amount of time to bring the forest into its desired future condition and that "there is no warranty or guarantee that these objectives will be achieved." Tr. Vol. IX, hh, pp, IV–1. The Forest Plan also provides for an on-going system of monitoring and further evaluation of the implementation of the Forest Plan so that decisionmakers within the Forest Service have "information on the progress toward achieving goals, objectives, and standards." Tr. Vol. IX, IV–1.

Plaintiffs raise four arguments upon which they base their position that the timber sales authorized by the Forest Service in Victoria violate NFMA: (1) the standards for snags established by the Forest Plan for the Black Hills National Forest are violated by the timber sales, (2) the standards for old growth established by the Forest Plan are violated by the timber sales, (3) the standards for cover and for habitat capability for white-tailed deer established by the Forest Plan are violated by the timber sales, and (4) NFMA is being violated by the Forest Service's failure to monitor Management Indicator Species (MIS).

### 1. Forest Plan Standards for Snags

■ Snags are defined as standing dead trees. Tr. Vol. VIII, A–20. Snags are significant because many species depend on snags for habitat. Tr. Vol. I, 227. In a forested diversity unit, the Forest Plan requires decisionmakers to provide a minimum of 4–6 snags per 10 acres, with a minimum of 8 inches diameter at breast height (dbh) where biologically feasible. Tr. Vol. IX, III–11. Also, the Forest Plan requires decisionmakers to provide a minimum of 300 down logs of 10 inches dbh or untreated piles of slash with 10 foot circumference, or a combination of down logs and slash piles per 1,000 acres in forested diversity units. Tr. Vol. IX, III–11, III–12. Furthermore, for management prescription areas designated as "2C,"[16] all standing snags which do not present a safety hazard are to be retained. Tr. Vol. IX, III–115.

Immediately prior to the preparation of the Environmental Assessment (EA) which accompanied the Decision Notice which plaintiffs are appealing in this case, the Victoria Planning Area was surveyed to document existing conditions in the area. Tr. Vol. I, 82. The current condition of the Victoria Planning Area apparently met the snag requirements, so the issue before the Forest Supervisor was how to maintain adequate numbers of snags. *See* Vol. I, 225.

The EA stated that merely leaving snags, dead-top trees, and two replacement trees per acre probably would not be sufficient to maintain adequate numbers of snags. Tr. Vol. I, 225. The EA recommended several ways in which future snags could be ensured, including creating snags by topping trees and allowing snags to be created through natural mortality. Tr. Vol. I, 226. The former alternative was prohibitively expensive, at $50 to $100 per tree. Tr. Vol. I, 226. The EA stated that sufficient numbers of snags could be created through natural tree mortality if at least 10 live trees with a minimum of 10 inches dbh were left standing per acre. Tr. Vol. I, 226.

Alternative # 4, the alternative adopted by the Forest Supervisor in this case, requires that all snags which are not safety hazards be left standing. Tr. Vol. I, 227. The decision also requires that 10 mature trees per acre would be left standing for "snag recruitment"—i.e. creation of snags through natural mortality. Tr. Vol. I, 227. The designated snags are to be left, when possible, in removal cuts or seed tree removals in clumps around existing snags and away from firewood-gathering areas. Tr. Vol. I, 227. Furthermore, the decision notice requires an ongoing system of snag monitoring to ensure that the number of snags remains adequate. Tr. Vol. I, 227.

Plaintiffs do not, and cannot, assert that future snag levels will certainly fall below Forest Plan standards if the decision notice at issue in this case is left undisturbed. Indeed, the Forest Supervisor herself could not guarantee that snag levels will remain adequate, although the projections made by the EA indicate that snag levels will be maintained. However, the Forest Supervisor could and did guarantee that Forest Plan standards are currently being met, that the alternative adopted was projected to continue to meet snag standards, and that the Forest Service would continue to monitor snags to ensure that the predictions in the EA are accurate and that snag standards continue to

---

**16.** Management prescription areas designated "2C" emphasize recreational opportunities and visual quality in concentrated public use areas. Vol. IX, III–114. The Tamarack Timber Sale in

the Victoria Planning Area appears to include the south portion of a prescription area designated "2C." *See* Vol. I, 81, 86.

be met in the future. Tr. Vol. I, 225–27. This, by no stretch of the imagination, can be called "arbitrary and capricious" decision-making.

## 2. Forest Plan Standards for Old Growth

 Old growth is defined as "[p]ine or spruce timber stands with 15 stems or more per acre of overstory greater than 20 inches [dbh] containing two or more canopy levels greater than 70 percent canopy coverage. Crowns should be in Keen's condition class 3 or 4 and the trees be 200 years or more in age with 2 or more snags per acre." Tr. Vol. VIII, A–13.

The Forest Plan requires structural diversity of vegetation. Tr. Vol. IX, III–11. To obtain this goal, the Forest Plan requires 5 percent or more old growth and 5 percent or more in grass/forb stages [17] in forested units of 5,000 to 20,000 acres in size. Tr. Vol. IX, III–11.

Immediately prior to the preparation of the Environmental Assessment (EA) that accompanied the Decision Notice which plaintiffs are appealing in this case, the Victoria Planning Area was surveyed to document existing conditions in the area. Tr. Vol. I, 82. The survey revealed that the Victoria Area currently contained less than 1 percent old growth and slightly more than 1 percent grass/forb stage areas. Tr. Vol. I, 115, 129. To try to meet both of these competing goals, the Decision Notice proposed designating 598 acres to become old growth while creating 393 acres of grass/forb stage areas through timber removal. Tr. Vol. I, 127 (Table 14). This would result in slightly more than 5 percent grass/forb stage areas and 7 percent designated old growth. Tr. Vol. I, 129.

The Victoria Area currently does not meet Forest Plan standards for old growth and old growth obviously cannot be created overnight because it is defined as being over 200 years old. Based on these observations, plaintiffs argue that the Forest Service should not be allowed to remove any mature pine from the Victoria Planning Area until Forest Plan old growth standards are met. However, plaintiffs' argument misses the other half of the equation: that the Victoria Planning Area is deficient in grass/forb stage areas also. The Forest Supervisor is not at liberty to ignore some Forest Plan standards in favor of other standards. If no timber were to be removed from the Victoria Planning Area, as plaintiffs suggest, the Forest Plan standards for grass/forb stage areas would continue to be violated.

The Forest Plan standards for old growth and for grass/forb stage areas are in a sense competing standards. One standard requires the continuing presence of trees in order to be met and the other standard requires the absence of trees in order to be met. The Forest Supervisor struck a reasonable compromise to try to meet both standards in providing for the designation of some timber to become old growth and the removal of other timber to create grass/forb stage areas. That decision was not arbitrary and capricious.

## 3. Forest Plan Standards for Cover and Habitat Capability for White–Tailed Deer

 For the Black Hills National Forest as a whole, deer hiding cover must be maintained at 20 percent on the perimeters of openings and 20 percent on the edges of arterial and collector roads, streams, and rivers. Tr. Vol. IX, III–14, III–15. Not more than 5 percent of the 20 percent hiding cover can be contiguous with other portions of hiding cover. Tr. Vol. IX, III–15.

For management prescription areas designated as "5B," [18] 30 percent of the area must be openings and 20 percent of the area must be thermal cover. Tr. Vol. IX, III–168. In 5B forested areas, 60 percent of the perimeter of openings must be hiding cover, 75

---

17. "Grass/forb" is defined as "[a]n early forest successional stage where grasses and forbs are the dominant vegetation." Tr. Vol. VIII, A–7. A "forb" is defined as an herb other than grass. Webster's New Collegiate Dictionary 448 (1975).

18. Management prescription areas designated "5B" emphasize wildlife winter range in nonforested areas. Tr. Vol. IX, III–161. The Sisters timber sales area appears to include the north portion of a prescription area designated "5B." Tr. Vol. I, 81, 86.

percent on the edge of arterial and collector roads must be hiding cover, and 40 percent along streams and rivers must be hiding cover. Tr. Vol. IX, III–168. In 5B forested diversity units, 40 percent hiding cover must be maintained and well distributed and 20 percent of thermal cover must be maintained. Tr. Vol. IX, III–168, III–169. In 5B areas, there must be 90 percent habitat *effectiveness* for deer and elk and 80 percent habitat *capability*. Tr. Vol. IX, III–169.

"Hiding cover" is defined as "[v]egetation capable of hiding 90 percent of a standing adult deer or elk from the view of a human at a distance equal to or less than 200 feet." Tr. Vol. VIII, A–4. "Thermal cover" is defined as "[c]over used by animals to ameliorate the effects of weather." Tr. Vol. VIII, A–4. For deer, thermal cover consists of "saplings, shrubs or trees at least 5 feet tall, with 75 percent crown closure, in stands of 2 to 5 acres in size." Tr. Vol. VIII, A–4.

The survey of the Victoria Area prior to the preparation of the EA revealed that the Victoria Area was deficient in three things needed for white-tailed deer habitat: cover, openings, and grass/forb stage areas. Tr. Vol. I, 131. The EA stated that if no timber sales took place, the habitat capability for white-tailed deer would continue to decline because there would continue to be fewer openings and grass/forb stage areas. Tr. Vol. I, 131.

In an attempt to meet Forest Plan standards for white-tailed deer habitat, the Decision Notice authorized timber sales, which would create more openings and grass/forb stage areas. The EA acknowledged that the timber sales, without any mitigation measures, would result in a decrease in existing cover for deer. Tr. Vol. I, 131. Therefore, the EA recommended, and the Decision Notice adopted the recommendation, that 187 acres should be withdrawn from the timber sales and set aside for the creation and maintenance of cover. Tr. Vol. I, 67, 131. The 187 acres which the Decision Notice reserved for the creation and maintenance of cover were selected because they had high basal areas, thus providing greater potential for cover, and because the selected cover areas were juxtaposed with foraging areas, thus

creating favorable deer habitat. Tr. Vol. I, 70. Alternative # 4 provides habitat *capability* for white-tailed deer of 84 percent while the present state of the Victoria Planning area provides only 78 percent habitat *capability*. Tr. Vol. I, 130 (Table 17). Thus, Alternative # 4 meets Forest Plan standards of 80 percent habitat capability for white-tailed deer.

Habitat *effectiveness* for deer is affected by the density of roads within the habitat. Tr. Vol. I, 134. In order to maintain 90 percent habitat *effectiveness* for white-tailed deer as required by the Forest Plan, the EA stated that the habitat should not have more than 2.5 miles of road per square mile. Tr. Vol. I, 134–35. The EA stated that it is almost impossible to meet this standard in Victoria due to the large numbers of existing roads used for access to private land and the existing primary roads. Tr. Vol. I, 135. This observation was not surprising in view of the fact that the Victoria Area is located between two highly-travelled state highways, is near several popular recreation areas, and is very near to the town of Rapid City, the second most populous city in South Dakota.

If the Forest Service were to take no action in the Victoria Area, the Forest Plan standards for deer habitat effectiveness would not be met because of the existing roads. Tr. Vol. I, 135. Alternative # 4 actually increased road densities in Victoria, because although some roads would be obliterated, others would be constructed. Tr. Vol. I, 136. In order to attempt to meet the 90 percent habitat effectiveness standard established by the Forest Plan, the EA recommended mitigation measures which included closing from January 1 through May 1 all roads in Victoria not needed for access to private land. Tr. Vol. I, 97, 136. This would produce approximately 2.9 miles of road per square mile on average for the entire year, and .4 miles of road per square mile for the area during winter. Tr. Vol. I, 136. In addition, all newly-constructed roads will be closed to public use. Tr. Vol. I, 97, Vol. IX, III–43. Thus, the habitat effectiveness for deer was brought to almost 90 percent.

As with the Forest Plan standards for old growth, the Forest Plan standards for white-

tailed deer habitat contain competing requirements. In order to create deer habitat, there must be a mixture of openings, grass/forb stage areas, and cover. The Victoria Area was deficient in all three requirements. Tr. Vol. I, 129. In order to create more cover, trees must be left standing, but in order to create more openings and grass/forb stage areas, trees must be cut. The Forest Supervisor made a reasonable compromise by cutting some trees and reserving others for the creation and maintenance of cover. The Forest Supervisor was not free, as plaintiffs seem to suggest, to leave all trees standing in order to meet cover requirements while ignoring the white-tailed deer habitat requirements for openings and grass/forb stage areas. The Forest Supervisor's decision was not arbitrary or capricious.

### 4. NFMA Requirement that MIS be Monitored

 Plaintiffs' last NFMA claim is that the Forest Service has failed to monitor Management Indicator Species (MIS) as required by regulation and by the Forest Plan for the Black Hills National Forest. *See* 36 C.F.R. § 219.19(a)(6); Tr. Vol. IX, IV–3, IV–4. Again, however, plaintiffs' argument fails upon examination of the administrative record.

The Forest Plan for the Black Hills National Forest indeed provides for monitoring and evaluation to determine the progress being made in the forest toward achieving the standards and goals of the Forest Plan. Tr. Vol. IX, IV–1. Monitoring of MIS species and their habitat, of which plaintiffs seem to complain, is to be accomplished using (1) RIS and other habitat bases, (2) program reviews, (3) activity reviews, (4) old growth scorecards, and (5) population inventories and harvest figures from state wildlife agencies. Tr. Vol. IX, IV–3. Monitoring for species dependent on cavities for their habitat is to be accomplished using forest data bases and inspections of timber sales areas. Tr. Vol. IX, IV–3. As to big game, the Forest Plan specifically provides that state wildlife agencies shall contribute to the monitoring process. Tr. Vol. IX, IV–4.

The administrative record in this case reveals that monitoring prior to this decision was accomplished using (1) RIS data base, (2) Stage II, (3) Habitat Diversity Scorecard, (4) HABCAP Model, (5) HEICALC Model, (6) SRS model, (7) field evaluation, and (8) aerial photos. Tr. Vol. I, 125. The record also reveals an inspection of the timber sales areas to ascertain populations of goshawks. Tr. Vol. I, 132. Furthermore, white-tailed deer were being monitored through use of population inventories and harvest records provided by the South Dakota Department of Game, Fish and Parks, a method of monitoring specifically condoned by the Forest Plan. *See* Tr. Vol. I, 155; Vol. IX, IV–3, IV–4. Plaintiffs have failed to show that the Forest Plan standards are not being met with regard to the monitoring issue.

It is important to remember, in discussing plaintiffs' NFMA claims, that NFMA and the Forest Plan for the Black Hills National Forest set forth multiple and sometimes conflicting requirements. It is also important to remember that the Forest Plan standards represent forest conditions which the Forest Plan desires the forest to attain in the future. The Decision Notice in this case represents a reasonable administrative attempt to meet the many Forest Plan standards and to do so as quickly as possible.

### CONCLUSION

Plaintiff the Sierra Club has standing to bring the instant lawsuit, thus rendering the inquiry as to the standing of Native Ecosystems, Inc., irrelevant. The plaintiffs failed to exhaust their administrative remedies as to two claims, thus preventing this Court from reaching the merits of those claims. As to plaintiffs' NEPA and NFMA claims which did satisfy the requirement of administrative exhaustion, the agency decision was reasonable and not arbitrary or capricious. Accordingly, it is hereby

ORDERED that plaintiffs' motion for summary judgment (Docket No. 57) is denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket No. 53) and the intervenor's motion for

summary judgment (Docket No. 49) are both granted.