**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 21 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DAVID S. LAMB; BRIAN
BRADEMEYER; BIODIVERSITY
ASSOCIATES; SIERRA CLUB,

      Plaintiffs - Appellants,

v.

TOM L. THOMPSON, in his official
capacity as Deputy Regional Forester
for the Rocky Mountain Region of the
U.S. Forest Service; FRANK J.
CROSS, in his official capacity as
District Ranger for the Pactola/Harney
Ranger District; UNITED STATES
FOREST SERVICE,

      Defendants - Appellees.

No. 00-1222

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-WM-2923)**

---

Julie A. Teel (Robert B. Wiygul, Earthjustice Legal Defense Fund, Denver,
Colorado, on the briefs), Denver, Colorado, for the Plaintiffs-Appellants.

M. Alice Thurston, Attorney, (Lois J. Schiffer, Assistant Attorney General, Wells
Burgess and Jeffrey Dobbins, Attorneys, with her on the brief), Environment &
Natural Resources Division, U.S. Department of Justice, Washington, D.C., for
the Defendants-Appellees.

Before **TACHA**, Chief Judge, **REAVLEY**,[*] and **LUCERO**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

This suit involves appellants', Biodiversity Associates', challenge to the Forest Service's approval of the Hollow Timber Sale in the Black Hills National Forest. Appellants claim that in approving the challenged timber sale the Service acted in violation of the Black Hills National Forest Plan and in violation of the National Forest Management Act. The district court denied plaintiffs' motion for summary judgment, granted judgment in favor of the Forest Service, and dismissed plaintiffs' claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm, but for different reasons than those stated in the district court.

**I**

**A. The National Forest Management Act**

Recognizing the "vital importance of America's renewable resources" and noting the "highly complex" issues raised by the management of the national forests, Congress enacted the National Forest Management Act of 1976, Pub. L. No. 94-588, 90 Stat. 2949 (codified at 16 U.S.C. §§ 1600 et seq.) ("NFMA"). The Act stated a "[c]ongressional policy of multiple use sustained yield

_____

[*] The Honorable Thomas M. Reavley, United States Court of Appeals for the Fifth Circuit, sitting by designation.

management," 16 U.S.C. § 1601(d), and provided for the "development and maintenance of land management plans for use on units of the National Forest System," § 1604(b). Specifically, NFMA requires that land and resource management plans "provide for multiple use and sustained yield of the products and services obtained" from national forest land and "in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." § 1604(e)(1).[1]

---

[1] Section 1604(e) refers to the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528–31, for definitions of the terms "multiple use" and "sustained yield." "Multiple use" is defined as:

> The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a).

> "Sustained yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.

(continued...)

- 3 -

1. Forest Planning

NFMA establishes a two-step process for forest planning. See generally Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167–68 (10th Cir. 1999); Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998). For a particular forest entrusted to its management, the Forest Service is first required to develop a land resource management plan ("LRMP"), or forest plan, to prepare an accompanying environmental impact statement ("EIS"), and to facilitate a public review process conducted in accordance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq. See 16 U.S.C. § 1604; 36 C.F.R. § 219.10(a), (b) (1982).[2] Second, the Forest Service is required to implement the forest plan by approving or disapproving specific projects. Projects must be consistent with the governing forest plan and are subject to the procedural requirements of NEPA. 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10(e) (providing that the "Forest Supervisor shall ensure that . . . all outstanding and future permits, contracts, cooperative agreements, and

---

[1](...continued)
§ 531(b).

[2] All references to NFMA's implementing regulations in this Opinion are to those in effect at the time of the agency action challenged herein.

other instruments for occupancy and use of affected lands are consist[e]nt with the plan."); <u>Colo. Envtl. Coalition</u>, 185 F.3d at 1168.

## 2. Timber Harvesting

NFMA requires the Secretary of Agriculture to establish standards to ensure that trees are not harvested until they reach the culmination of mean annual increment of growth ("CMAI"). 16 U.S.C. § 1604(m). "CMAI is the age at which the rate of growth among a stand of young trees peaks and after which annual growth remains level or declines. CMAI is a traditional silvicultural definition designed to maximize the volume yield from a given area." (Appellees' App. at 223 (Charles F. Wilkinson & H. Michael Anderson, <u>Land and Resource Planning in the National Forests</u> 125 (1987)).)[3] The CMAI standard is subject to statutory exceptions set forth in § 1604(m)(1) as well as other exceptions to be established in accordance with § 1604(m)(2).[4]

---

[3] Silviculture is:

(1) Generally, the science and art of cultivating forest crops, based on the study of the life history and general characteristics of forest trees and stands, with particular reference to local factors; (2) more particularly, the theory and practice of controlling the establishment, composition, constitution, and growth of forests for varying purposes.

(X A.R. at A-19.)

[4] NFMA's CMAI requirement and its exceptions are discussed in more depth in Section IV of this Opinion.

**B. The Black Hills National Forest**

In 1983, a LRMP for the Black Hills National Forest[5] was implemented pursuant to 16 U.S.C. § 1604.[6] The Plan "provides for the coordinated multiple use of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness in the management of the Black Hills National Forest, resulting in sustained yields of goods and services for the benefit of the American people." (XI A.R. pt. 1, Record of Decision for Black Hills National Forest LRMP at 1.)

The Black Hills Plan contains a number of specific habitat management provisions designed to meet the statutory goal of providing a diversity of plant and animal communities in the National Forests. See 16 U.S.C. § 1604(g)(3)(A) (requiring the Secretary of Agriculture to establish regulations insuring management for provision of wildlife and fish in the National Forests); § 1604(g)(3)(B) (requiring the Secretary of Agriculture to establish regulations providing for diversity of plant and animal life in the National Forests); 36 C.F.R. § 219.19. Among those provisions is a general direction to provide raptor habitat accompanied by a guideline regarding the specific proportions of old growth

---

[5] This forest plan is variously referred to throughout the opinion as "the Plan," "the Forest Plan," "the Black Hills Plan," and the "1983 Plan."

[6] During the period in which this case has been pending in the agency and in the federal courts, a new forest plan for the Black Hills has been approved. Because the project at issue was approved under the 1983 Plan, however, we need not consider the new plan.

timber that should be maintained to achieve that provision. The goshawk, a kind of raptor, is designated as a sensitive species as well as a management indicator species for the Black Hills. A management indicator species is one whose "population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1).

1.      Hollow Project Proposals

The dispute before us centers on the Hollow Project Area, an area of approximately 3861 acres[7] that lies within the Black Hills National Forest. Because the Hollow Project Area was failing to meet the "Desired Future Condition" ("DFC") set forth in the Forest Plan (II A.R. at II-3), in June 1995 the Pactola/Harney Ranger District of the Black Hills National Forest issued an Environmental Assessment ("EA") of the Hollow Project Area. The EA proposed certain "vegetative management activities" (id. at II-31), including the Hollow Timber Sale, which were specifically designed to "move toward meeting Forest Plan goals and objectives" (id. at II-32). Those goals and objectives included

---

[7] Of the 3861 acres in the Hollow Project Area, 2788 are National Forest System land, and 1073 are privately owned. The Forest Plan assigns different "management emphasis" to individual portions of the Forest in order to facilitate the Forest's multiple-use objectives. (II A.R. at II-32.) The Hollow Project Area is divided into three different management areas: (1) fifty acres are designated for riparian area management; (2) 188 acres are designated for roaded natural recreation opportunities; and (3) 2550 acres are designated for wood fiber production and utilization.

increased yield of timber products, habitat diversity, visual diversity, management of fire and insect risks, conservation of soil and water resources, and maintenance of "aesthetic values." (Id. at II-33 to II-34.)  Among the activities proposed to meet the DFC of the Plan were:  overstory removal, commercial thinning, commercial timber harvests, patch clearcuts, pine removal from meadows, hardwood release, and precommercial thinning.

The EA set forth four alternative project proposals.  Aside from the no-action alternative, Alternative 1, the proposals involved some variation of a timber sale.  Alternative 2 "would treat the most acreage"; Alternative 3 would "treat the least acreage" and maintain "more cover for wildlife species"; and Alternative 4 would involve the "least amount of road construction."  (Id. at II-40.)  Any of the four proposals, according to the EA, would result in four percent of the Hollow Project Area being "designated as old growth." (Id. at II-47.)  Only two percent of the designated old growth was actually old growth at the time of the EA; the rest of the designated old growth stands were in "various structural stages."  (Id. at II-69.)[8]

---

[8]  The Forest Service uses a grading system to identify the successional stage of a particular area of forest.  The stages are as follows, from earliest successional stage to latest:  stage 1, grass/forb, the period in which "grasses and forbs are the dominant vegetation" (X A.R. at A-7); stage 2, shrub-seedling; stage 3, sapling-pole; stage 4, mature; and stage 5, old growth.

The specific environmental effects of each of the proposed alternatives are analyzed in the EA. The raptor management section acknowledges "concern[s] that populations and reproduction of the goshawk are declining in forests" and that these "declines may be associated with forest changes caused by timber harvesting. However, fire suppression, livestock grazing, drought, and toxic chemicals may be involved." (Id. at II-79.) The analysis then concludes that Alternatives 2 and 4 "have the lowest habitat potential for goshawks" and that Alternative 2 provides less mature dense canopy stands, i.e., goshawk nesting habitat, than Alternative 4. (Id.) The environmental effects section on silviculture states that the patch clearcut proposals of each of the action alternatives need not meet the requirements of CMAI because the clearcuts "will be created for other than timber management purposes . . . . 36 CFR 219.16(2)(iii) . . . ." (Id. at II-65 to II-67.) The EA also concludes that each of the action alternatives will result in meeting the grass/forb habitat diversity requirements of the Plan.

Chapter 2 of the EA sets forth mitigation measures to be used in reducing "the potential adverse impacts that may result from implementing the proposed activities." (Id. at II-41.) One of the mitigation measures involves special treatment of goshawk nest sites, although a 1993 survey showed no active goshawk nests in the Hollow Project Area.

2.    Hollow Project Approval

After reviewing the EA of the Hollow Project Area District Ranger, Frank Cross, approved Alternative 2—with some modifications—in a Decision Notice and Finding of No Significant Impact ("FONSI") dated June 20, 1995. Before analyzing the four alternatives, Cross stated that the proposals were designed to achieve ten goals, including (1) provision of short- and long-term sources of wood fiber, (2) management of old growth stands and grass/forbs to meet the Plan's minimum requirements, (3) enhancement of tree species other than pine to increase vegetative diversity, (4) protection of threatened, endangered, and Forest Service Sensitive plants and animal species, and (5) management of fuels to reduce the risk of catastrophic wildfire. The approved project, Alternative 2, provides for the cutting of 1.808 million board feet of sawtimber and 598 cubic feet of products other than logs on 906 acres of land. Additionally, the project provides for 3.1 miles of new road construction and 1.7 miles of road reconstruction.

## C. Procedural Background

In August 1995, several plaintiffs, including appellants, Biodiversity Associates, administratively appealed the Forest Service's decision approving the Hollow Project. Plaintiffs objected to the decision on the grounds that (1) the Hollow Timber Sale would violate the CMAI standard, (2) the approved Sale

- 10 -

would log the most mature trees of any of the alternatives and would thus destroy the most goshawk and raptor habitat while only designating younger stands as "future" old growth and therefore future raptor habitat, and (3) the Forest Service had prematurely painted trees for sale and logging before public comment. In a decision dated September 27, 1995, Tom Thompson, Deputy Regional Forester, denied plaintiffs' appeal. Thompson concurred with the Appeal Reviewing officer's conclusion that Cross's decision did not violate law, regulation or policy.

The instant suit is before us on plaintiffs' appeal from the district court's March 28, 2000, order denying their request for summary judgment and dismissing their complaint with prejudice.[9] Specifically, appellants argue that the district court erred in its conclusions regarding raptor habitat and the CMAI requirements of 16 U.S.C. § 1604(m)(2).

## II

We review the district court's summary judgment order de novo and apply "the same legal standard employed by the district court." Kingsford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1127–28 (10th Cir. 2001) (citing Fed. R. Civ. P.

---

[9] The district court accepted the January 15, 1997, recommendation of the magistrate judge. The denial of summary judgment to plaintiffs resulted in dismissal with prejudice because plaintiffs conceded that there were no genuine issues of material fact for the district court to consider.

56(c)).  Because appellants stipulated that there are no genuine issues of material fact, we need only determine whether, under Rule 56(c), appellee was entitled to judgment as a matter of law.

We review the Forest Service's final decision under the Administrative Procedure Act, 5 U.S.C. §§ 701–06, to determine whether that decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  Colo. Envtl. Coalition, 185 F.3d at 1167 (quoting 5 U.S.C. § 706(2)(A)).[10]  Although the arbitrary and capricious standard is a "narrow one," we are required to "engage in a substantial inquiry[,] . . . a probing in-depth review."  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 416 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  In determining whether the agency's action was arbitrary, we must "consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment."  Id. at 416.  Although "'[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given,'" we will "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

---

[10]   We owe no deference to the district court's review of the agency's action and conduct a de novo review of the administrative record.  Colo. Envtl. Coalition, 185 F.3d at 1167 n.5; Hoyl v. Babbitt, 129 F.3d 1377, 1382 (10th Cir. 1997).

Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1975)).  In other words, we can not "substitute [our] judgment for that of the agency."  Overton Park, 401 U.S. at 416.  An agency's decision will be deemed arbitrary and capricious if

> the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

## III

Appellants first argue that the Forest Service erred in approving the Hollow Timber Sale despite the undisputed fact that the Hollow Project Area currently fails to meet the raptor habitat provisions of the Black Hills Forest Plan.  The lynchpin of the argument is that the "raptor habitat acreage requirement contained in the Forest Plan is a mandatory requirement" such that allowing the Forest Service to move the Black Hills farther away from the raptor standard is contrary to the clear terms of the Forest Plan.  (Appellants' Br. at 15.)  Under the reasoning of the lower court, appellants assert, there is "nothing to prevent the Forest Service from designating saplings as 'future' old growth, and cutting all the mature raptor habitat."  (Id.)  Citing 16 U.S.C. § 1604(g)(3)(B) and 36 C.F.R.

§§ 219.19, 219.27(a)(6),[11] appellants state that the Black Hills must be managed to provide diversity of animal communities.  Finally, appellants cite 16 U.S.C. § 1604(i) and 36 C.F.R. § 219.10(e) for the proposition that the "Forest Service must make all resource management decisions in accordance with [the raptor habitat] requirement."  (Appellants' Br. at 16.)

In response, the Service argues that the diversity unit in which the Hollow Project Area lies does not currently meet the raptor habitat provision and that the two percent of old growth that does exist will not decline under any of the alternatives proposed in the EA—not even the alternative chosen.  The Service further asserts that the proposed project is the result of an exercise of its particular expertise in determining how to best achieve the multiple-use requirements of NFMA and of the applicable forest plan.  Ultimately, it argues the project chosen was devised to meet the diversity directions of the hundreds of standards in the Black Hills Plan, including the allegedly competing raptor habitat and grass/forb standards, neither of which is met in the Forest's current condition.

---

[11] 36 C.F.R. § 219.19(a) states that planning alternatives "shall establish objectives for the maintenance and improvement of habitat for management indicator species . . . to the degree consistent with overall multiple use objectives." (Emphasis added.)  Similarly, 36 C.F.R. § 219.27(a)(6) states that "[a]ll management prescriptions shall . . . [p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species and provide that habitat for [indicator species] is maintained and improved to the degree consistent with multiple-use objectives established in the plan." (Emphasis added.)

According to that view, achievement of the raptor habitat standard is necessarily a long-term prospect, given the current state of the Black Hills, which the "Hollow Timber Sale is reasonably designed to meet." (Appellees' Br. at 28.) Although the Service acknowledges that Alternative 2 results in less raptor nesting habitat because it retains fewer structural stage 4c stands than Alternative 3, the Service asserts Alternative 2 is preferable because in the long term it provides for production of more timber, addresses a greater area of the forest, increases visual variety of vegetation, best addresses increased fire danger from catastrophic wildfires, and results in the greatest economic return.

Because appellants are correct in asserting that the Black Hills must be managed to provide for a diversity of animal and plant communities, see, e.g., 16 U.S.C. § 1604(g)(3)(B), and that the Forest Service must make management decisions in accordance with the Black Hills Plan, see, e.g., 16 U.S.C. § 1604(i), we must only decide whether the raptor habitat provision is a mandatory, immediately binding, overriding requirement and, if it is not, whether the Service's approval of Alternative 2 was arbitrary and capricious in light of the Plan's raptor habitat provision.[12] The Service argues that the "provision of raptor

---

[12] Appellants do not challenge the validity of the Plan itself but rather the Service's interpretation of and adherence to the Plan's requirements, namely the raptor habitat provision. Accordingly, we are not required to determine whether the Plan meets the requirements of NFMA.

- 15 -

habitat is not an overriding requirement which must be met to comply with the 1983 Forest Plan and NFMA's diversity requirements, given the competing goals and constraints embodied in the 1983 Forest Plan." (Appellees' Br. at 32.) Our standard of review requires us to give the Service's interpretations of its own regulations, in this case the provisions of the 1983 Forest Plan, "controlling weight unless [they are] plainly erroneous or inconsistent with the regulation[s]." Stinson v. United States, 508 U.S. 36, 45 (1993) (quotation omitted) (citing cases for the same proposition); Sierra Club v. Martin, 168 F.3d 1, 4 (11th Cir. 1999) (noting that "the Forest Service's interpretation of its Forest Plan should receive great deference from reviewing courts."); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (noting that an agency's interpretation of its own regulations is entitled to "substantial deference"). In order to determine whether the Service's interpretation of the raptor habitat provision is reasonable, we must examine the structure of the Black Hills Plan.

The Record of Decision approving the 1983 Black Hills Forest Plan states that the Plan "establishes broad direction and does not attempt to anticipate and resolve every short-term problem or conflict which may arise in man[a]gement of the Black Hills National Forest." (XI A.R. pt. 1, Record of Decision for Black Hills National Forest LRMP at 2.) Listed as a "[m]ajor feature[]" of the Plan is

that it "identifies the desired condition of the Black Hills National Forest to be achieved in the future." (Id. at 1.)

The first important chapter of the LRMP for the Black Hills National Forest describes the "management situation," including the then-present condition of the Forest and the expected future condition after implementation of the Plan. (Id. at II-1.) In the section describing the Forest's future, the Plan notes its "key feature . . . is its multiple use mix of outputs. No resource output is emphasized to the extent that standards for another resource are violated." (Id. at II-27.) Next, the LRMP for the Black Hills describes its "long-range management direction," which is to be used "in analyzing proposals by prospective forest users" and in implementing the Forest Plan. (Id. at III-1.) Management direction is broken down into Forest Direction, i.e., "goals, objectives and management requirements which are generally applicable to the entire Forest," and Management Area Direction, i.e., "management requirements specific to individual areas within the Forest." (Id.) The Forest Direction section consists of: (1) goals—"concise statements describing a desired condition to be achieved sometime in the future" (id. at III-3), (2) objectives—"concise, time-specific, measurable results that respond to the goals" (id. at III-5), and (3) management requirements—"the baseline conditions that must be maintained throughout the Forest in carrying out th[e] Plan" (id. at III-10). Management requirements are further broken down

into three successive categories: management activities, general direction statements, and standards and guidelines. "Management activities are work processes that are conducted to produce, enhance, or maintain levels of outputs, or to achieve administrative and environmental quality objectives." (Id.) General direction statements "specify the actions, measures, or treatments . . . to be done when implementing the management activity or the condition expected to exist after the general direction is implemented." (Id.) Finally, standards and guidelines "are quantifications of the acceptable limits within which the general direction is implemented." (Id.)

Found within the Plan's Management Requirements—the "baseline conditions that must be maintained throughout the Forest in carrying out th[e] Plan"—is the raptor habitat acreage provision at issue in this case. To implement the "General Direction" to "[p]rovide raptor habitat," a quantitative standard instructs the Service to "[p]rovide 250 acres of old growth timber per 5,000 acres in 20–30 acre blocks." (Id. at III–16.)

Although we find the structure of the Black Hills Plan far from lucid or user-friendly, we can not conclude the Service unreasonably interpreted the Plan when it determined that the raptor habitat acreage provision is not overriding. As an initial matter, the language of the 1983 Plan itself is forward-looking: it indicates a desire to achieve raptor habitat through provision of a specific

- 18 -

quantity of old growth forest. The word "provide" can be reasonably interpreted as meaning to provide what does not currently exist. Along the same lines, the relevant management activity is not only to maintain current habitat but to improve overall habitat—a necessarily forward-looking goal.

The Service's argument that it is required to balance the many standards set forth in the 1983 Plan is not inconsistent with the structure and the language of the Plan itself, nor is it, as appellants assert in their reply brief, a "post-hoc construction by lawyers." (Appellants' Reply Br. at 1.) First, the Plan expressly states that its "key feature . . . is its multiple use mix of outputs. No resource output is emphasized to the extent that standards for another resource are violated. An integrated mix of resource outputs is provided rather than a single function emphasis that maximizes some outputs to the exclusion of others." (XI A.R. pt. 1 at II-27.) Second, in the FONSI approving the Hollow Timber Sale, Ranger Cross explicitly based his approval of modified Alternative 2 on its provision of the "best balance between the issues identified during the scoping process," one of those issues being the provision of adequate raptor habitat, i.e., old growth forest. (II A.R. at II-11.) Although the Service's attempt to paint the grass/forb and raptor habitat provisions as competing appears to be post hoc and, more offensively, a gratuitous attempt to liken this case to Sierra Club v. United States Forest Service, 878 F. Supp. 1295 (D.S.D. 1993), our review of the FONSI

shows the Service in fact chose Alternative 2 because it concluded that alternative better addressed a number of management issues, including the grass/forb habitat requirements of the Forest Plan. Specifically, the FONSI states Alternative 2 was superior because (1) it "provides higher timber yield[] than alternatives 1, 3 and 4," (2) it "thins and treats fuels on more acres than other alternatives," thereby reducing the destructive potential of future forest fires, (3) it "more completely me[ets]" the "objectives of providing wood fiber production" than the other alternatives, (4) it results in more structural variety of ponderosa pine stands, (5) it "treats more acres and increases the visual variety of the vegetation," and (6) it "would result in the greatest [economic] return of all action alternatives."[13] (II A.R. at II-11 to II-14.)[14] Notably, the Service also identified Alternative 2's potential drawbacks in the analysis: for instance, the fact that the chosen alternative calls for construction of additional roads and would "result in slightly more impacts than Alternatives 3[] and 4" with regard to the Plan's standards for

---

[13] The economic evaluation admittedly "did not weigh heavily in [the Service's] decision." (II A.R. at II-14.)

[14] The explicit analysis in the FONSI of why Alternative 2 is superior to the other alternatives demonstrates the weakness of appellants' argument that the "Service chose the alternative that moved the area furthest away from the requirements of the Forest Plan." (Appellants' Reply Br. at 2.) Although Alternative 2 admittedly moves the Forest farther away, at least in the short term, from the raptor habitat provision of the Plan, as discussed above, it moves the Forest closer to other provisions of the Plan, furthering the overarching multi-use objectives.

soil, water, and riparian habitat. (Id. at II-11, II-13.) The FONSI additionally notes that Alternative 2 "favors wildlife species which prefer early successional stages over wildlife species which prefer mature, old growth forests" but highlights the accompanying increase in the "variety of vegetation types and ages across the project." (Id. at II-15.)

In sum, we conclude the Service's interpretation of the raptor acreage habitat provision as not immediately binding and overriding is reasonable. Moreover, our review of the Forest Plan and of the FONSI do not lead us to conclude that the Service acted arbitrarily or capriciously when it adopted Alternative 2 even though that alternative admittedly favors animal species that prefer earlier successional stages of forest. The FONSI shows the Service actively and explicitly balanced, on the record, the provisions of the Forest Plan and chose Alternative 2 because, in the Service's expert assessment, it best balanced the many issues identified in the scoping process and best met the multi-use and diversity requirements of the Forest Plan. Although we may well have reached a different conclusion if faced with the decision regarding raptor habitat in the first instance, our standard of review does not allow us "to substitute [our] judgment for that of the agency" where, as here, the agency's decision "was based on a consideration of relevant factors," does not involve a "clear error of judgment," and is accompanied by an explanation that comports with the evidence

in the record.  Overton Park, 401 U.S. at 416; Friends of the Bow, 124 F.3d at 1215.

## IV

Appellants' second argument in this appeal involves the interpretation and application of 16 U.S.C. § 1604(m), which provides for the establishment of standards to ensure CMAI and for exceptions to those standards.  We review an agency's construction of a statute which it administers under the familiar Chevron two-step analysis.  First, we ask "whether Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).  "If the intent of Congress is clear, that is the end of the matter . . . [because we] must give effect to the unambiguously expressed intent of Congress."  Id. at 842–43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question . . . is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.

The CMAI provisions of NFMA state:

The Secretary shall establish—
   (1) standards to insure that, prior to harvest, stands of trees throughout the National Forest System shall generally have reached [CMAI] . . . : Provided, That these standards shall not preclude the use of sound silvicultural practices, such as thinning or other stand improvement measures: Provided further, That these standards shall not preclude the Secretary from salvage or sanitation harvesting of timber stands which are substantially damaged by fire, windthrow or other catastrophe, or which are in imminent danger from insect or disease attack; and

(2) exceptions to these standards for the harvest of particular species of trees in management units after consideration has been given to the multiple uses of the forest including, but not limited to, recreation, wildlife habitat, and range and after completion of public participation processes utilizing the procedures of subsection (d) of this section.

16 U.S.C. § 1604(m). The public participation subsection referred to in § 1604(m)(2) states:

The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

§ 1604(d).

Appellants assert that any exceptions to CMAI that are not self-executing under § 1604(m)(1) must be subject, pursuant to § 1604(m)(2), to the same public participation processes to which a forest plan is subject under § 1604(d) so that the "public will have a say in important decisions concerning public resources." (Appellants' Br. at 19; see also id. at 18.) The Hollow Timber Sale, appellants continue, violates NFMA because the Forest Service failed to solicit the required public participation for practices which, when employed, would violate CMAI. Finally, appellants argue that the Service's interpretation of § 1604(m)(2) renders the section redundant and without purpose. In order to "give effect . . . to every

clause and word" of NFMA, it must be that the exceptions to CMAI themselves are required to go through the "public participation processes utilizing the procedures of [§ 1604(d)]." Bennett v. Spear, 520 U.S. 154, 173 (1997).

The Service answers that the challenged practices meet the requirements of § 1604(m)(2) because they were subject to public participation as part of the overall forest plan at the time the Plan itself was subject to public participation under § 1604(d). (See II A.R. at II-64 ("Silviculture methods . . . are consistent with those methods specified in the Black Hills Land and Resource Management Plan (Forest Plan pages III-106 through III-219).").) Moreover, it argues, the silvicultural practices approved in the Plan "inherently require cutting of trees before achieving CMAI, if a sale area is currently deficient in either the desired variety of vegetation or habitat." (Appellee's Br. at 42.) The Service does not read the statute to require explicit highlighting of exceptions to CMAI or to require subjecting such exceptions to special public participation. Instead, the Service reads § 1604(m)(2) as requiring it to "establish exceptions to the CMAI standard after consideration of the multiple uses of the affected forest and after the specified public participation required for the development . . . of the . . . forest plan which considers these multiple uses." (Id. at 36 (emphasis added).) In accordance with this interpretation, the district court concluded "that the public participation in the development of the Forest Plan satisfied the exception to the

CMAI standard." Biodiversity Assocs. v. Thompson, No. 95-WM-2923, slip op. at 3 (D. Colo. March 28, 2000).

We apply the traditional canons of statutory construction when interpreting a statute. Among these canons is the "cardinal principle . . . that it is our duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." Bennett, 520 U.S. at 173 (quoting United States v. Menasche, 348 U.S. 528, 538 (1955) (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937), and Montclair v. Ramsdell, 107 U.S. 147, 152 (1883))) (internal quotations and alterations omitted); see also Matthieson v. Banc One Mortgage Corp., 173 F.3d 1242, 1244 (10th Cir. 1999) (stating that "[t]he starting point of every statutory construction problem is with the language of the statute itself" and noting our duty to give effect to every clause and word of a statute); Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 810 (10th Cir. 1998); United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997) (applying the principle of statutory construction requiring a court to give effect to every word, reversing district court's interpretation of the statute, and concluding the statute was unambiguous). Applying this principle to the plain language of § 1604(m)(2), we arrive at the same conclusion as appellants: the Service's interpretation of § 1604(m)(2) renders that subsection's public participation requirement redundant and without purpose. If, as the Service argues,

§ 1604(m)(2) permits the Service to establish exceptions to CMAI so long as the Plan itself has been subject to public participation, the public participation requirement of § 1604(m)(2) is rendered surplusage because the Plan must necessarily go through § 1604(d) whether or not CMAI is at issue.[15]  Because we conclude NFMA § 1604(m)(2) is not ambiguous and Congress's intent is clear from the structure of the statute,[16] we need not defer to the Service's interpretation.  Chevron, 467 U.S. at 842–43.  We hold that under § 1604(m)(2) an exception to CMAI itself must explicitly be subject to public participation.

The next step in our analysis is to determine whether the challenged exceptions to CMAI contained in the Hollow Timber Sale were the subject of public participation.  As an initial matter, we address the Service's argument that the now-challenged exceptions to CMAI met the public participation requirement

---

[15]  In addition, the statute does not say "after completion of the public participation process of § 1604(d)."  Instead, it says "after completion of public participation processes utilizing the procedures of [§ 1604(d)]."  That language shows congressional intent to employ the processes of subsection (d) in another context.

[16]  Even if we were to assume the statute is ambiguous, we would conclude in the second step of Chevron that the Service's interpretation of § 1604(m)(2) cannot stand because it renders words in the statute "mere surplusage." Sundance, 139 F.3d at 810.  "Although we afford deference to the [agency's] interpretation of a statute under [its] purview, we cannot overlook an interpretation that flies in the face of the statutory language."  Id.; see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 229 (1994) ("An agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear.").

of § 1604(m)(2) because the management practices that will cause the exceptions were subject to public participation at the time of the approval of the Black Hills Plan. After careful review of the record, we reject this argument. Not only are we unable to locate any discussion in the Black Hills Plan concerning exceptions to CMAI, but we are unable to conclude that the management practices proposed therein "inherently require cutting of trees before achieving CMAI." (Appellee's Br. at 42.) It may be obvious to the Forest Service with its specialized knowledge of silvicultural practices that the employment of certain practices will entail exceptions to CMAI, but it is not clear or even discernable to this Court. Nor does the Service provide evidence that these "inherent" exceptions to CMAI were obvious to the public at the time the 1983 Plan was subject to public participation. Congress's intent is without effect unless those who lack specialized knowledge are able to recognize proposed exceptions to CMAI and are able to participate meaningfully in the associated public processes. Although we give full latitude to agencies in their areas of expertise, when Congress has clearly commanded an agency to seek the public's input the agency violates its statutory duty when it conceals its plans in the specialized terminology of its expertise.

Although we reject the Service's argument and the district court's conclusion that the public participation requirements of § 1604(m)(2) were met at the time of the approval of the Black Hills Plan, we ultimately conclude that those

requirements were met at the time of the approval of the Hollow Project. The record establishes that the different action alternatives considered in the Hollow Project EA necessarily entailed exceptions to CMAI and that these exceptions were subject to public participation.[17] The apparentness of the exceptions to CMAI is established by, among other things, the Service's own mention of the CMAI issue in the EA (id. at II-65), the discussions in the EA that all of the action alternatives involved removal of younger trees, i.e., trees which had not reached CMAI (see, e.g., id. at II-68, Ponderosa Pine Structural Stages Table (showing clearly that each of the action alternatives would result in fewer trees in stages 3b and 3c than the no-action alternative)), and the fact that Biodiversity and at least one other member of the public raised CMAI concerns during the public participation processes associated with the EA (II A.R.at II-124 to II-125, Hollow Draft EA Comments, March 8, 1995, signed by Black Hills Group, Sierra Club and Biodiversity Associates; id. at II-175, March 19, 1995, letter by Nancy Hilding).[18] Because the Hollow Project EA sufficiently alerted the public that the

---

[17] We do not conclude, as a matter of law, that compliance with NEPA's public participation procedures is sufficient to meet the requirements of NFMA § 1604(d). Instead, our review of the record demonstrates that the public participation processes associated with the EA in this particular case were sufficient to meet NFMA's command.

[18] We emphasize that our conclusion that the Service met the commands of § 1604(m)(2) is limited to the particular circumstances of this case. We do not penalize appellants for any specialized knowledge they may have about

(continued...)

actions considered entailed exceptions to CMAI and because those exceptions were subject to public participation at the time of the public scoping process associated with the Hollow Project EA, we conclude that the Service complied with the commands of § 1604(m)(2).

## V

In sum, we conclude that the Forest Service acted neither arbitrarily nor capriciously with regard to the raptor habitat provisions of the 1983 Black Hills Forest Plan when it approved Alternative 2 of the Hollow Timber Sale. Although we reject as unsupportable the Service's interpretation of § 1604(m)(2), we conclude that the Service did not violate its duties under that section. For the alternative reasons offered in this Opinion, the summary judgment order of the district court is **AFFIRMED**. The appeal is **DISMISSED**.

---

[18](...continued) silvicultural practices and their environmental effects that allowed them to spot CMAI concerns that the general public was not able to discern. If the Hollow Project EA did not have clear indicators that the CMAI standard would be compromised in enacting the proposed projects, appellants' expressed concerns regarding CMAI, standing alone, would not have been sufficient to demonstrate the Service met the commands of § 1604(m)(2)—i.e., to demonstrate the Service explicitly subjected the proposed exceptions to CMAI to public participation utilizing the procedures of § 1604(d).