**F I L E D**

PUBLISH

**January 12, 2006**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THE SILVERTON SNOWMOBILE CLUB, on behalf of its members; THE COLORADO SNOWMOBILE ASSOCIATION, on behalf of its members; COLORADO OFF-HIGHWAY VEHICLE COALITION, on behalf of its members,

      Plaintiffs - Appellants,

      v.

UNITED STATES FOREST SERVICE; RICK D. CABLES, in his official capacity as Regional Forester, Region 2, U.S. Forest Service; MARK STILES, in his official capacity as Forest Supervisor, San Juan National Forest, U.S. Forest Service; PAULINE ELLIS, in her official capacity as District Ranger, Columbine Ranger District, San Juan National Forest, U.S. Forest Service, and as Field Office Manager, San Juan Field Office, the U.S. Bureau of Land Management; UNITED STATES BUREAU OF LAND MANAGEMENT; RON WENKER, in his official capacity as Colorado State Director, U.S. Bureau of Land Management,

      Defendants - Appellees,

SAN JUAN CITIZENS ALLIANCE and COLORADO MOUNTAIN CLUB,

      Defendants - Intervenors - Appellees.

No. 05-1005

Paul A. Turcke, Moore Smith Buxton & Turcke, Chartered, Boise, Idaho
(D. Andrew Wight, Colorado Off-Highway Vehicle Coalition, Denver, Colorado,
with him on the briefs) for Plaintiffs-Appellants.

Matthew J. Sanders, United States Department of Justice, Environment & Natural
Resources Division, Washington, D.C. (Lois Witte, Of Counsel, Office of General
Counsel, United States Department of Agriculture, Golden, Colorado; John Kunz,
Of Counsel, Office of the Regional Solicitor, United States Department of the
Interior, Lakewood, Colorado; Kelly A. Johnson, Acting Assistant Attorney
General, Denver, Colorado; William J. Leone, Acting United States Attorney,
Denver, Colorado; Jerry N. Jones and Mark S. Pestal, Assistant United States
Attorneys, Denver, Colorado; and Todd S. Aagaard, Attorney, United States
Department of Justice, Environment & Natural Resources Division, Washington,
D.C., with him on the briefs) for Federal Defendants-Appellees.

Amelia S. Whiting, Western Resource Advocates, Boulder, Colorado (Michael
Chiropolos, Western Resource Advocates, Boulder, Colorado; and Jeffrey C.
Parsons, Lyons, Colorado, with her on the briefs) for Defendants-Intervenors-
Appellees.

Before **HENRY**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

**ANDERSON**, Circuit Judge.

This case involves an environmental law challenge to actions by various

federal agencies regarding changes in winter recreational access to an area,

known as the Molas Pass area, near Highway 550 in Colorado. The district court ruled in favor of the agencies on all claims.

More particularly, plaintiffs Silverton Snowmobile Club ("SSC"), the Colorado Snowmobile Association ("CSA") and the Colorado Off-Highway Vehicle Coalition ("COHVCO") appeal an order of the United States District Court for the District of Colorado affirming a Decision Notice and Finding of No Significant Impact ("Decision"), and accompanying Final Environmental Assessment ("EA"), issued by the United States Forest Service ("Forest Service") and the United States Bureau of Land Management ("BLM"). SSC alleges that the Decision was issued in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1782. The San Juan Citizens Alliance ("SJCA") and the Colorado Mountain Club ("CMC") were granted permission by the district court to intervene in this action and they participate on appeal as appellee-intervenors. We affirm the district court's decision.

**BACKGROUND**

The Molas Pass area consists of approximately thirty-seven square miles of public land, with elevations ranging from 9,000 to more than 13,000 feet, located forty-two miles north of Durango, Colorado. EA at 5, Administrative Record ("AR") at 848. It includes both sides of a stretch of U.S. Highway 550. It lies partly within the San Juan National Forest, which is managed by the Forest Service and partly within public lands that are managed by the BLM. Id.

Prior to the Decision challenged in this appeal, the area was used by both motorized and nonmotorized recreationists. The San Juan National Forest Land and Resource Management Plan ("Forest Plan") of 1983, as amended in 1992, designated a zone of up to one-and-one-half miles on each side of Highway 550 as 2B Management Area Prescription. The 2B Prescription states that "activities such as . . . snowmobiling . . . are possible." AR at 337. The 1985 BLM San Juan Resource Area Management Plan ("RMP") limited motorized use to certain roads and trails in the Silverton Special Recreation Management Area. In April 1994 the SSC entered into a Memorandum of Understanding ("MOU") with the San Juan National Forest for the purpose of setting out the responsibilities of both parties with regard to maintenance and grooming of trails in the Forest. Under the MOU, the SSC agreed, *inter alia*, to groom and maintain certain trails, and the Forest Service agreed, *inter alia*, to "[m]ake selected areas available for snowmobiling activities and facilities." MOU, Appellant's App. at 30.

-4-

During the winters of 1998-99 and 1999-2000, a lack of snow at lower elevations in Colorado caused an increased concentration of motorized and non-motorized recreation in the Molas Pass area. Decision at 1-2, AR at 987-88. Conflicts between these two groups of recreationists led to letters to the editor of a local newspaper and complaints to Federal land managers and the San Juan County Commissioners. This in turn prompted the Forest Service and the BLM to initiate a public process to evaluate whether changes were necessary in the winter recreation management protocols applicable to the Molas Pass area. The agencies accordingly held two open houses and a workshop in early 1999 and formed an interdisciplinary team ("IT"), whose mission was "to review the public input; develop alternatives to address the issues; and analyze the environmental, social, and economic effects of all alternatives." Decision at 3, id. at 989. During the open houses and through comments the agencies received from the public, the nonmotorized users of the area expressed their desire to "recreate safely in an area free of noise, fumes, and intrusion of motorized vehicles," EA at 7, id. at 854, while motorized users expressed their desire not to lose any areas currently available for motorized use, and to expand motorized use in the area near Silverton.

The agencies developed the following goal for management of the Molas Pass area: "To provide visitors with an opportunity for a quality motorized and

nonmotorized winter recreational experience, where both user groups have safe highway access to their sport of choice, and where both private and commercial uses are appropriately balanced." Decision at 2, id. at 988. The IT held a public workshop in June 1999 in which participants broke into three small working groups and assessed various alternatives. In July and August 1999 the agencies mailed summaries of the workshop results and a timeline for a draft environmental assessment to everyone who had attended the open houses and workshops or who had indicated some interest in the matter. Numerous articles, editorials and letters from interested citizens appeared in local newspapers.

In November 1999, the agencies issued a draft environmental assessment ("Draft EA"), which presented four alternatives for winter use management of the Molas Pass area: (1) no action, which would leave winter management of the area unchanged; (2) maintaining the area west of Highway 550 for motorized winter use and making the area east of the highway a strictly nonmotorized area; (3) maintaining the area east of the highway for motorized use and making the area west of the highway a strictly nonmotorized area; and (4) expanding by 3600 acres the motorized area west of the highway, designating the area east of the highway and south of the top of Molas Pass a strictly nonmotorized area, and permitting grooming from the top of Molas Pass north and west of the highway.

The agencies provided a sixty-day period for comments on the Draft EA. They received 815 comment letters, of which 40% favored Alternative 1, 6% favored Alternative 2, 1% favored Alternative 3, 27% favored Alternative 4, and 26% expressed no preference. Additionally, 60% of the comments favored some sort of segregation of motorized and nonmotorized uses.

The agencies also consulted with the United States Fish and Wildlife Service ("FWS") about what effects the alternatives might have on the twenty-four species listed as sensitive, threatened, or endangered under the Endangered Species Act, 16 U.S.C. §§ 1531-1544. In November 2000, the FWS issued a Biological Evaluation and Biological Assessment ("BE/BA") addressing those effects. The BE/BA concluded that the proposed alternatives "[m]ay affect the Canada lynx, but is not likely to adversely affect the continued existence of the species or result in destruction or adverse modification of critical habitat." EA at 61, AR at 910. The BE/BA explained that the Molas Pass area "contains potential foraging, denning, and travel habitat [for the Canada lynx], especially the spruce/fir ecosystem surrounding the large open meadows of the area." EA at 48, id. at 897. A map included in the BE/BA indicates that 8,461 acres out of a total of 27,388 acres in the relevant area provide a suitable habitat for lynx. EA at 55, id. at 904. As discussed more fully infra, there was an ongoing effort to re-introduce lynx into the area.

In assessing the impact of the proposed alternatives on the lynx, the BE/BA noted that "[s]now compaction may cause a direct effect on lynx by potentially increasing predator competition" but that because "lynx seldom venture more than 330 feet into open areas, . . . the area that is being considered for motorized use will have very little, if any, additional effect on any individual lynx than what currently exists." EA at 51, id. at 900. The BE/BA also noted that the prohibition of nighttime commercial activities would permit the lynx "nocturnal periods of foraging without disruption by human activities." EA at 61, id. at 910.

Operating under the principle that "if there is potential habitat, . . . we assume the species is present" the BE/BA listed mitigation measures. EA at 52, id. at 901. The two mitigation measures relevant to this case are a prohibition on night-time grooming and the prohibition of "groomed tracks within 330 feet of late-seral spruce-fir." EA at 48, id. at 897.

In June 2001, the agencies released their Decision, final EA and Finding of No Significant Impact ("FONSI"), which discussed the same four alternatives and considered their direct, indirect and cumulative effects. The Decision blended Alternatives 1 and 4 as follows: it prohibited motorized activity on 200 acres in the Andrews Lake area, leaving motorized users with 6,900 acres (97%) of the acreage previously open for that use; it prohibited trail grooming and commercial motorized uses on National Forest System lands from the Molas Pass Overlook

south to Lime Creek on the east side of Highway 550; it converted the 1994 MOU to a special-use permit with annual approvals by the Forest Service; it eliminated the prohibition on motorized use off of designated roads and trails on certain BLM lands and the BLM agreed to revise its RMP through a "Maintenance Document" to reflect that change; and it prohibited motorized activities in the Bear Creek drainage in order to protect Silverton's water source. Additionally, the Decision implemented mitigation measures, including prohibiting night-time motorized operations and prohibiting new groomed trails with 330 feet of late-seral spruce-fir forests.

Tracy Beck, the Acting District Ranger who signed the Decision, explained his reasons for the Decision as follows:

> In designing the selected alternative, I tried to address the needs of both motorized and nonmotorized user groups. The motorized users did not want to lose many acres to nonmotorized users, while the nonmotorized users wanted the Andrews Lake area free of motorized use.
>
> I believe that the blending of Alternatives 1 and 4 with mitigation measures from the EA is the most responsive of all alternatives to the purpose of and need for this analysis.

Decision at 10, AR at 996. He further explained that the problem the Decision addressed was "primarily a social issue, not an environmental one." Id.

Plaintiffs, non-profit organizations whose members enjoy engaging in winter motorized activities, including snowmobiling, in the Molas Pass area,

appealed the Decision to both the Forest Service, through the Regional Forester, and the BLM, through the Interior Board of Land Appeals ("IBLA"). On September 10, 2001, the Forest Service upheld the Decision. On April 5, 2005, the IBLA upheld the Decision.

Meanwhile, on February 19, 2002, the plaintiffs filed suit in the federal district court in Colorado.[1] They alleged that the agencies had violated: the Administrative Procedure Act, 5 U.S.C. §§ 701 - 706 ("APA"), by taking actions, making findings and reaching conclusions that were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable law; NEPA, and its supporting regulations, by reaching a predetermined result, failing to take the requisite "hard look" at the environmental consequences of their actions, and failing to prepare an Environmental Impact Statement ("EIS"); NFMA, and its supporting regulations, by failing to follow the requirements for compliance with and amendment of the Forest Plan; and FLPMA, and its supporting regulations, by failing to follow the requirements for compliance with and amendment of the

_____

[1]Besides the Forest Service and the BLM, the plaintiffs named as defendants Rick D. Cables, the Regional Forester of Region 2, which includes the San Juan National Forest; Calvin N. Joyner, the Forest Supervisor of the San Juan National Forest; Bruce R. Short, the District Ranger for the Columbine Ranger District of the San Juan National Forest; Ann Morgan, the State Director of the Colorado BLM; and Tracy Beck, the Field Office Manager for the San Juan Field Office of the BLM.

RMP. They requested declaratory and injunctive relief to prevent implementation of the Decision.

On April 24, 2002, the SJCA and the CMC filed a motion to intervene as defendants, which the district court granted on December 11, 2002. On July 3, 2002, the plaintiffs moved for a preliminary injunction, which the district court denied on October 20, 2003. On December 3, 2003, the parties filed a joint motion to have the court dispose of the case on its merits. The court heard oral argument on March 19, 2004, and issued an order upholding the Decision on November 1, 2004. Plaintiffs appeal, alleging that the court erred in holding that the agencies did not violate the APA or NEPA, that it further erred in holding that, although the agencies did violate the NFMA by failing to conform to or amend the Forest Plan, that violation was harmless error, and by dismissing their FLPMA claim for failure to exhaust their administrative remedies.

The agencies and the appellee-intervenors SJCA and the CMC have filed a motion to strike the portion of the plaintiffs' reply brief which argues that "the Molas Pass Decision's 'lynx-based restrictions fail arbitrary and capricious review'" under the APA. J. Mot. to Strike at 2 (quoting Appellants' Reply Br. at 7). We address this motion *infra*, in connection with our analysis of the Decision's discussion about lynx.

**DISCUSSION**

We review the agencies' compliance with NEPA, NFMA and FLPMA pursuant to the APA, which "'empowers a reviewing court to hold unlawful and set aside [final] agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1268 (10th Cir. 2004) (quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002), modified on reh'g, 319 F.3d 1207 (10th Cir. 2003)). In reviewing the agencies' action, "we apply the same deferential standard to the administrative record as did the district court." Id. We may set aside agency action "only for substantial procedural or substantive reasons." Id. (further citation omitted).

**I. NEPA**

NEPA, 42 U.S.C. §§ 4321-4370f, "'prescribes the necessary process' by which federal agencies must 'take a "hard look" at the environmental consequences' of the proposed courses of action." Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1150 (10th Cir. 2004) (quoting Utahns for Better Transp., 305 F.3d at 1162-63). It imposes no "substantive limits on agency conduct." Friends of the Bow v. Thompson, 124 F.3d 1210, 1213 (10th Cir.

-12-

1997) (citing <u>Robertson v. Methow Valley Citizens' Council</u>, 490 U.S. 332, 350 (1989)).  "Rather, once environmental concerns are adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions." <u>Pennaco Energy, Inc.</u>, 377 F.3d at 1150 (further quotation omitted).

Before an agency may take "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), an agency must prepare an environmental impact statement ("EIS") in which the agency considers the environmental impacts of the proposed action and evaluate "alternatives to the proposed action," <u>id.</u> § 4332(2)(C)(iii), including the option of taking "no action," 40 C.F.R. § 1502.14(d).  However, "[a]gencies need not prepare a full EIS . . . if they initially prepare the less detailed environmental assessment ('EA') and, based on the EA, issue a finding of no significant impact ('FONSI'), concluding that the proposed action will not significantly affect the environment."  <u>Lee v. U.S. Air Force</u>, 354 F.3d 1229, 1237 (10th Cir. 2004) (further quotation omitted); <u>see also</u> 40 C.F.R. § 1501.4 (providing that the agency shall prepare an EA to determine whether an EIS is required).  An agency's decision to issue a FONSI rather than prepare an EIS "is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review."  <u>Comm. to Preserve Boomer Lake Park v. Dep't of Transp.</u>, 4 F.3d 1543, 1555 (10th Cir. 1993).

The agencies in this case issued an EA and a FONSI. The plaintiffs argue that, in doing so, the agencies violated the APA and NEPA because (1) the outcome was predetermined; (2) the agencies failed to take the requisite "hard look" at the potential environmental consequences of the proposed action; and (3) the agencies failed to prepare an EIS.

## 1. Predetermined result

The plaintiffs argue that the agencies violated NEPA in issuing the Decision because they "structured the analysis and framed the issues to ensure that additional restrictions on the use of snowmobiles in the area would be an inevitable result of the analysis." Appellants' Opening Br. at 14. We disagree.

The agencies articulated the goal for their review of winter use in the Molas Pass area as being "[t]o provide visitors with an opportunity for a quality *motorized* and nonmotorized winter recreational experience, where *both* user groups have safe highway access to *their sport of choice*." Decision at 2, AR at 988 (emphasis added). Nonmotorized users defined a "quality experience" for them to be "the ability to recreate safely in an area free of noise, fumes, and intrusion of motorized vehicles." Id. Motorized users indicated they did "not want to lose any areas currently designated as motorized, and also they would like

-14-

additional terrain in the Silverton area." Id. The Decision explained the

difficulty in accommodating the desires of both groups:

> We would rather have had people work together to solve their joint
> social issues, while being sensitive to each other's needs. Both
> motorized and nonmotorized recreationists should strive to show
> more tolerance for one another and more inclination to work in a
> spirit of cooperation.
> . . . .
> When user groups do not want to give up what they feel is theirs, and
> become polarized, the fairest solution becomes compromise (and all
> users inevitably give up something). Given the diversity of public
> opinions regarding winter recreation at Molas Pass, the selected
> alternative became the compromise alternative.

Decision at 11, id. at 997. Far from ignoring motorized users' wishes, one of the

"Project Guidelines" stated that the project would "address the need for additional

suitable terrain for motorized recreation." EA at 7, id. at 854.

In the end, the alternative selected took away 200 acres from motorized

recreationists—approximately 3% of the total available for motorized use—but

opened up additional terrain for motorized use by allowing such use off-trail in

the BLM's Silverton Special Recreation Management Area. The agencies rejected

alternatives which would have resulted in greater reductions in the acreage

available to motorized users. In short, the agencies were faced with the difficult

task of trying to accommodate different groups of users who were reluctant to

give up what they had become accustomed to using. After hearing input from the

public and considering a number of alternatives, the agencies reached a

-15-

compromise solution, not one that was predetermined by their method of analysis.[2]

## 2. Hard look

The plaintiffs further argue that the agencies failed to take a "hard look" at the potential environmental consequences of the alternatives, as NEPA requires. As we have previously stated, documents prepared as part of NEPA's "hard look" requirement "must not only reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project, but also provide a reviewing court with the necessary factual specificity to conduct its review." Comm. to Preserve Boomer Lake Park, 4 F.3d at 1553. Plaintiffs allege that "[t]he EA for Molas Pass Winter Recreation Management is inadequate because it neither reflects the required 'thoughtful and probing' analysis nor provides the 'necessary factual specificity' to permit a proper review by this Court." Appellants' Opening Br. at 19 (quoting Comm. to Preserve Boomer Lake Park, 4 F.3d at 1553). In particular, plaintiffs allege that the EA made the

_____

[2]In support of their argument that the result of the agencies' analysis was predetermined, the plaintiffs cite Metcalf v. Daley, 214 F.3d 1135 (9th Cir. 2000). In Metcalf, the court held that the federal agency had violated NEPA by preparing an untimely and inadequate EA analyzing the environmental impacts of a whale hunt, where the federal agency had already entered into an agreement permitting the whale hunt. Id. at 1144. That is a very different situation from this case, where the agencies had no preexisting agreement with any user group.

unsubstantiated assumption that the Molas Pass area included Canada lynx habitat and that snowmobile use and trail grooming adversely affect the lynx.

The BE/BA contained in the EA did, in fact, proceed upon the following assumption with respect to the lynx and all other species identified as relevant to the Decision: "[t]here have been no structured inventories completed, specifically for this proposal, in the area because the Forest has taken the position that if there is potential habitat, then we assume the species is present." EA at 52, AR at 901. Plaintiffs in essence argue that this assumption violates NEPA's "hard look" requirement. We disagree.

As we have stated many times, NEPA mandates procedural steps, not particular substantive results or outcomes.

> A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA. . . . Courts are not in a position to decide the propriety of competing methodologies . . . but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors.

Comm. to Preserve Boomer Lake Park, 4 F.3d at 1553. The lynx was listed in March 2000 as a "threatened" species under the Endangered Species Act. The agencies concluded that "[t]he area contains potential foraging, denning, and travel habitat [for lynx], especially the spruce/fir ecosystem surrounding the large open meadows of the area." EA at 48, AR at 897. The agencies further noted that in 1998, "the Colorado Division of Wildlife conducted extensive field

surveys to determine if there are enough snowshoe hares [on whom lynx prey] to support a reintroduction of lynx during the winters of 1999 and 2000." Id. "The determination was positive enough throughout southwest Colorado to support the re-introduction process." Id. Accordingly, ninety-six lynx were reintroduced into the area and were being tracked. Of the ninety-six re-introduced lynx, thirty-one were known to have died as of February 2001. AR at 768. The tracking showed that "one of the transplanted lynx is known to occupy an area" some ten miles from the Molas Pass area. EA at 49, id. at 898.

The EA further indicated that, among the reasons for minimizing snow compacting in potential lynx habitat is the desire not to "preclude the ability to re-establish" lynx in the area. EA at 50, id. at 899. The EA noted that "[i]t is unclear from the literature the degree of tolerance lynx have to human uses." EA at 51, id. at 121. It further noted that "[r]ecreational use of the area is currently considered moderate, but . . . will probably increase dramatically in the next 10 years." Id. Given all of this information—that there was an ongoing effort to re-introduce lynx, a threatened species, into the area, that there was potential lynx habitat in the area, that the effect of human activity on lynx was uncertain, but that human activity in the area was expected to increase dramatically in the next decade, and that at least one lynx had been sighted near the area—we cannot say that the agencies' determination to treat at least part of the area as lynx habitat

-18-

and adopt appropriate mitigation measures did not have a rational basis or consider relevant factors. It satisfied NEPA's "hard look" requirement.

In their reply brief, plaintiffs, represented by different counsel, raise a different argument concerning the agencies' treatment of the lynx. They argue that the decision to impose "lynx-based restrictions fail[s] arbitrary and capricious review under the APA." Appellants' Reply Br. at 7. Citing for the first time a Ninth Circuit decision, Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, 273 F.3d 1229 (9th Cir. 2001), they argue that "this management strategy [is] illegal as a matter of law." Appellants' Reply Br. at 9.

The agencies and intervenors have filed a joint motion to strike this portion of the reply brief, arguing that plaintiffs failed to make this argument "in their administrative appeal, complaint, district court briefing, or opening appeal brief." Joint Mot. to Strike at 3. We agree with the agencies and intervenors that plaintiffs have not made this argument before their reply brief. There are accordingly multiple reasons why we will not address it. "Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004) (quoting Vt. Yankee Nuclear Power Corp. v.

Natural Res. Def. Council, 435 U.S. 519, 553 (1978)). The Supreme Court held in Pub. Citizen that,

> [b]ecause respondents did not raise these particular objections to the EA, [the agency] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available. Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.

Id. at 764-65; see also Barron v. Ashcroft, 358 F.3d 674, 677 (9th Cir. 2004) ("It is a well-known axiom of administrative law that 'if a petitioner wishes to preserve an issue for appeal, he must first raise it in the proper administrative forum.'"); Kleissler v. U.S. Forest Serv., 183 F.3d 196, 202 (3rd Cir. 1999) ("[W]e hold that the claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court."); N.M. Envtl. Improvement Div. v. Thomas, 789 F.2d 825, 835 (10th Cir. 1986) (holding that an issue was waived because not raised before the agency); Wilson v. Hodel, 758 F.2d 1369, 1372 (10th Cir. 1985) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice.").

Furthermore, we have held that "[t]he failure to raise an issue in an opening brief waives that issue." Anderson v. U.S. Dep't of Labor, 422 F.3d 1155, 1174 (10th Cir. 2005) (citing State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994)). "Consistent with these principles is the general rule that 'appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply brief.'" Id. (quoting Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1277-78 (10th Cir. 1994)).

It is clear that, throughout the administrative proceedings, before the district court, and in their opening brief, plaintiffs' argument about the absence of lynx in the Molas Pass area was confined to an allegation that the agencies' alleged failure to substantiate the existence of lynx in the area was a violation of NEPA's procedural obligation to take a "hard look" at the potential environmental effects of the proposed action. Thus, plaintiffs' administrative appeal frames the issue as follows:

> all of these references to lynx and lynx habitat are irrelevant because the Forest Service has not provided the specific factual prerequisite to their relevance: that lynx do, in fact, inhabit the analysis area. This is precisely the type of factual defect that the Tenth [C]ircuit has held renders an environmental analysis fatally flawed for failure to take a "hard look."

Appeal at 12, AR at 1021 (emphasis added). The district court analyzed their lynx argument in the context of their allegation that the agencies failed to take a "hard look" at the environmental consequences of the Decision. Order at 9,

Appellant's App. at 55. In their opening brief, plaintiffs framed the argument in the identical fashion. Appellant's Opening Br. at 19. Their argument has consistently been that the agencies violated NEPA's "hard look" requirement when they assumed the existence of lynx in the Molas Pass area, without, they claim, sufficient hard data supporting that assumption. They did *not* argue that that assumption is a substantive violation of some other applicable law, or that it is arbitrary and capricious under the APA outside of the NEPA "hard look" context. We accordingly conclude that they have waived that argument.[3]

Were we to address it, however, in our discretion, plaintiffs would fare no better. Plaintiffs argue we should find the agencies' Decision respecting the lynx arbitrary and capricious, based upon the Ninth Circuit's decision in Ariz. Cattle Growers' Ass'n, 273 F.3d 1229. Ariz. Cattle Growers' Ass'n is distinguishable. In that case, the court held that the FWS acted arbitrarily and capriciously under the Endangered Species Act when it issued incidental take statements, pursuant to the ESA, regarding harm to species listed as endangered when there was no evidence the species existed in the relevant area. The court was interpreting specific provisions of the ESA which have no application to this case. We see no reason to impose those context-specific holdings to this case.

---

[3]We can deem the issue waived without needing to strike any portion of plaintiffs' reply brief. We accordingly deny the motion by the agencies and the intervenors to strike portions of that brief.

Furthermore, the lack of evidence of the existence of the particular species at issue in Ariz. Cattle Growers' Ass'n was much more egregious than what plaintiffs claim is present here. For example, the FWS in that case admitted that "there have been no reported sightings of the razorback sucker in the area since 1991," some six years prior, and that there had been "an unsuccessful attempt to repopulate the project area between 1981-1987." Id. at 1243-44. The court held "[t]his speculative evidence, without more, is woefully insufficient to meet the standards imposed by the governing statute." Id. at 1244. As indicated, in this case there was much more substantial and recent evidence of re-introduction efforts and the viability of the habitat for lynx, as well as a sighting of lynx near the Molas Pass area. More fundamentally, however, the agencies in this case were fulfilling their obligation to take a "hard look" at the potential environmental consequences of the proposed action. While that included consultation with the FWS in order to ensure that the Decision did not violate the ESA, the agencies were not making determinations regarding incidental take statements under particular provisions of, and in the discharge of particular obligations imposed by, the ESA.

### 3. Failure to issue an EIS

NEPA requires the preparation of an EIS, rather than the less detailed EA, for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see Greater Yellowstone Coal., 359 F.3d at 1274. The agencies in this case determined that an EIS was not necessary after preparing an EA, and instead issued a FONSI. "'An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise.'" Id. (quoting Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir. 2002)) (further quotation omitted). Plaintiffs, however, failed to raise this issue in the administrative proceedings. They have accordingly waived it. See Pub. Citizen, 541 U.S. at 764-65; N.M. Envtl. Improvement Div., 789 F.2d at 835; Wilson, 758 F.2d at 1372.

### II. NFMA

NFMA provides for the "development and maintenance of land management plans for use on units of the National Forest System." 16 U.S.C. § 1604(b); see Lamb v. Thompson, 265 F.3d 1038, 1042 (10th Cir. 2001). "NFMA establishes a two-step process for forest planning." Id. First, the Forest Service prepares a forest plan. The creation of a forest plan requires the preparation of an EIS. 16 U.S.C. § 1604(g)(1); 42 U.S.C. § 4332(2)(C); see Colo.

-24-

Off-Highway Vehicle Coal. v. U.S. Forest Serv., 357 F.3d 1130, 1132 (10th Cir. 2004). "Second, the Forest Service is required to implement the forest plan by approving or disapproving specific projects. Projects must be consistent with the governing forest plan and are subject to the procedural requirements of NEPA." Lamb, 265 F.3d at 1042 (citing 16 U.S.C. § 1604(i)).

> NFMA provides that forest plans may
>
> be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

16 U.S.C. § 1604(f)(4). "Any significant amendments to a forest plan must also follow the same procedures required for the creation of the original forest plan." Colo. Off-Highway Vehicle Coal., 357 F.3d at 1132 (citing 36 C.F.R. § 219.8(b)).[4]

---

[4]The regulations which implement NFMA have been frequently amended. At the time the agencies issued the Decision, the agencies represent that the Forest Service was operating under an interim revised planning rule that the Department of Agriculture had promulgated in 2000. See 65 Fed. Reg. 67,514 (Nov. 9, 2000) (codified at 36 C.F.R. pt. 219 (2001)). Under the 2000 rule, the Forest Service could elect to prepare Forest Plan amendments under either the provisions of the 1982 planning rule, see 47 Fed. Reg. 43,026 (Sept. 30, 1982) (codified at 36 C.F.R. pt. 219 (1982)) or the provisions of the 2000 rule, see 36 C.F.R. § 219.35(b) (2000). The current 2005 version allows the Forest Service to prepare Forest Plan amendments or revisions initiated before or during the transition period established by the 2000 rule under the provisions of either the 1982 rule or under the 2005 rule. 36 C.F.R. § 219.14(d)-(e) (2005). See

(continued...)

Plaintiffs claim the agencies violated NFMA because they changed the Forest Plan at issue in this case without formally amending it. In particular, they argue that, prior to the Decision, an area adjacent to Highway 550 and surrounding Andrews Lake was designated 2B Management Area Prescription. As such, "[m]otorized and non-motorized recreation activities such as . . . snowmobiling . . . are possible. . . . Motorized travel may be prohibited or restricted to designated routes, to protect physical and biological resources." AR at 790. Following the Decision, that area (part of a larger area designated as 2B Prescription) was converted to an A travel management area on which motorized use is banned. Plaintiffs argue that conversion was a significant change necessitating an amendment to the Forest Plan.[5] The agencies assert that no such amendment was necessary.

_____

[4](...continued)
generally Utah Envtl. Cong. v. Bosworth, 421 F.3d 1105, 1110 (10th Cir. 2005).

[5]The Decision explicitly stated that "[b]ecause the . . . changes in travel management do not reflect any changes in Forest Plan Management Direction of Prescriptions for the area, no Forest Plan amendment is required." Decision at 5, AR at 991. However, the EA noted that "the existing travel-management scheme may need to be amended." EA at 7, id. at 854. The Regional Forester Appeal Deciding Officer who affirmed the Decision in plaintiffs' administrative appeal to the Forest Service noted that the Decision and EA contained some confusing language: "[s]ome of the discussion pertaining to these different forms of management direction is confusing, e.g., the EA begins by describing the Forest Plan Management Area prescriptions . . . . However, . . . [later] the EA switches to a discussion of the travel management designations, but never relates the two sets of management direction to each other." AR at 1056 (citations omitted).

-26-

Whichever version of the regulations concerning Forest Plan amendments we apply, see supra note 4, it is clear that an amendment requires compliance with NEPA provisions, consultation with other agencies and appropriate public involvement. See 36 C.F.R. § 219.10 (1982); id. § 219.8(b) (2001); id. § 219.4(b) (2005). That was clearly done in this case, whether it is called an amendment of the Forest Plan or not. It is difficult to imagine what further analysis could have been done, given the agencies' compliance with NEPA, including the intense focus placed on where snowmobiling would be permitted. For all reasonable intents and purposes, there was no error committed here, other than perhaps the failure to label the agencies' action as accomplishing an "amendment." NFMA protects the meaningful and substantive procedures that fall under a label, not mere nomenclature. In this case, the very change plaintiffs claim should have been made by way of amendment was at the front and center of the view of the agencies and the public as they followed NEPA's required analysis. It would be wasteful and meaningless to require the agencies at this point to merely label their conduct as amending the Forest Plan. We therefore conclude that no NFMA error occurred.[6]

---

[6]It follows from our analysis that, were we to conclude that an error had occurred, we would consider it harmless. We acknowledge that "[t]he role of harmless error in the context of agency review is constrained." Nat. Res. Def. Counsel v. U.S. Forest Serv., 421 F.3d 797, 807 (9th Cir. 2005); see also Gifford

(continued...)

## III.  FLPMA

Finally, plaintiffs argue that the Decision violated FLPMA because it stated

that "[t]he BLM will adopt a travel-management policy for the Silverton Special

Recreation Management Area that specifically allows motorized use on

and off trails and roads in winter and revise its *San Juan Resource Area*

*Management Plan* through a 'Maintenance Document' to reflect that intent."

Decision at 5, AR at 991.  Plaintiffs argue that the issuance of a Maintenance

Document is insufficient under applicable regulations to implement such a

change.  They assert that amendment of the Resource Area Management Plan is

required.

The district court held it lacked jurisdiction over this claim because

plaintiffs had failed to exhaust their administrative remedies, inasmuch as the

IBLA had not yet ruled on their appeal of the Decision to that body.  The IBLA

has now ruled, affirming the Decision:

---

[6](...continued)
Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1071 (9th Cir.
2004).  Thus, it "may be employed only 'when a mistake of the administrative
body is one that *clearly* had *no bearing* on the procedure used or the substance of
the decision reached.'"  Id. (quoting Buschmann v. Schweiker, 676 F.2d 352, 358
(9th Cir. 1982) (further quotation omitted)).  In this case, assuming that the ban
on snowmobiling in the relevant areas did require an amendment of the Forest
Plan, we would conclude that the failure to prepare a formal amendment was
harmless.  See Save Our Heritage, Inc. v. Fed. Aviation Admin., 269 F.3d 49, 61-
63 (1st Cir. 2001).

BLM correctly points out that even if, as appellants argue, the change in snowmobile use was more than minor but rather constituted an expansion in resource use such that an amendment to the RMP is required, all of the procedures attendant upon an amendment were followed here. In fact, appellants do not and cannot dispute that the challenged decision was made only (1) after preparation of an environmental assessment of the proposed action and alternatives to it as provided by 43 CFR 1610.4-6 and 1610.5-5, (2) full public involvement in which BLM and the Forest Service received and considered 815 comment letters as prescribed in 43 CFR 1610.2, and (3) complete interagency coordination (and an interagency task force) as required by 43 CFR 1610.3. . . . Although appellants state that the procedures of 43 CFR 1610.5-5 'have not been followed,' they cannot point to any more procedure that was required for a plan amendment than was provided by the agencies.

Order at 5, IBLA 2001-373, Br. of Fed. Appellees, Addendum B (citation omitted).[7] Although the IBLA has now ruled, plaintiffs plainly had not exhausted their administrative remedies when they filed their complaint in the district court.

---

[7]As both the district court and the IBLA pointed out, plaintiffs' claim to have suffered an injury as a result of the expansion of snowmobiling in the Silverton Special Recreation Management Area is suspect. After all, plaintiffs are organizations of persons interested in snowmobiling, and have complained in the rest of this lawsuit about reductions in the terrain available for snowmobiling.

<u>See</u> 43 C.F.R. § 4.21(c).[8]  We accordingly affirm the district court's dismissal of this claim.

## CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.

------

[8] 43 C.F.R. § 4.21(c) provides:

Exhaustion of administrative remedies.  No decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(4) of this section or a decision has been made effective pending appeal pursuant to paragraph (a)(1) of this section or pursuant to other pertinent regulation.